ACCEPTED
03-15-00436-CV
6131184
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/20/2015 10:39:40 AM
JEFFREY D. KYLE
CLERK

## No. 03-15-00436-CV

### In the Third Court of Appeals
### Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/20/2015 10:39:40 AM
JEFFREY D. KYLE
Clerk

### CHARLES O. "CHUCK" GRIGSON,
*Appellant,*

**v.**

### THE STATE OF TEXAS; THE TEXAS DEPARTMENT OF INSURANCE; THE TEXAS COMMISSIONER OF INSURANCE; and FARMERS GROUP, INC. ET AL.,
*Appellees.*

On Appeal from the 261st Judicial District Court, Travis County, Texas
Cause No. D-1-GV-02-002501

### APPELLEES' JOINT RESPONSE TO APPELLANT GRIGSON'S EMERGENCY MOTION TO STAY THE SENDING OF CLASS NOTICE

Marcy Hogan Greer
State Bar No. 08417650
mgreer@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON &
TOWNSEND LLP
515 Congress Ave., Suite 2350
Austin, Texas 78701
Telephone: 512-482-9300
Telecopier: 512-482-9303

M. Scott Incerto
State Bar No. 10388950
scott.incerto@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
Telephone: 512-474-5201
Telecopier: 512-536-4598

**COUNSEL FOR DEFENDANTS-APPELLEES
THE FARMERS PARTIES**

Joshua R. Godbey
State Bar No. 24049996
joshua.godbey@texasattorneygeneral.gov
Ryan S. Mindell
State Bar No. 24089707
ryan.mindell@texasattorneygeneral.gov
Jennifer S. Jackson
State Bar No. 24060004
jennifer.jackson@texasattorneygeneral.gov
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 475-4209
Fax: (512) 477-2348)

**COUNSEL FOR PLAINTIFFS-APPELLEES, THE
STATE OF TEXAS, THE TEXAS DEPARTMENT OF
INSURANCE, AND THE TEXAS COMMISSIONER
OF INSURANCE**

TO THE HONORABLE COURT OF APPEALS:

Appellees, the State of Texas, the Texas Department of Insurance and the Texas Commissioner of Insurance (jointly, "the State") and the Farmers Parties[1] (together with the State, the "Settling Parties") file this Joint Response, asking the Court to deny Appellant Grigson's Emergency Motion to Stay the Sending of Class Notice ("Motion to Stay"). The Settling Parties additionally request that the Court consider and grant, on an expedited basis, their Joint Motion to Dismiss Appeal for Lack of Appellate Jurisdiction and Request for Expedited Consideration of Motion ("Motion to Dismiss").

## PRELIMINARY STATEMENT

Having failed to defeat preliminary approval of the settlement in this 12-year-old case,[2] Appellant Charles O. "Chuck" Grigson ("Grigson") has now filed a baseless interlocutory appeal of the district court's Order of Preliminary Approval. Bootstrapping off that improper appeal, Grigson filed his Motion to Stay, asking the Court to prevent the Settling Parties from finally informing the approximately

---

[1] Farmers Group, Inc., Fire Underwriters Association, Farmers Underwriters Association, Farmers Insurance Exchange, Fire Insurance Exchange, Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Farmers Texas County Mutual Insurance Company, Truck Insurance Exchange, and Truck Underwriters Association

[2] See the "Background Facts" provided in the Appellees' Joint Motion to Dismiss Appeal for Lack of Appellate Jurisdiction and Request for Expedited Consideration of Motion, which are incorporated here by reference. Those facts in the Motion to Dismiss and stated here are in the personal knowledge of the undersigned, and so, no affidavit in support is needed. TEX. R. APP. P. 10.2.

1.8 million class members about the settlement. In his Motion to Stay, Grigson makes several conclusory, incorrect arguments that are all premised on the propriety or success of his interlocutory appeal. Because, as demonstrated in the Settling Parties' Motion to Dismiss, there is no conceivable basis for an interlocutory appeal in this case, Grigson's Motion to Stay must also fail. There is, in short, no reason to unnecessarily stay class notice, 12 years overdue, for an improper appeal over which this Court lacks jurisdiction.

## ARGUMENT

### I. Grigson Cannot Appeal the Preliminary Approval Order and Therefore Cannot Obtain a Stay of Class Notice

Grigson baldly asserts that he is appealing the "order entered on July 6, 2015 *certifying* a settlement class action." Motion to Stay, at 2 ¶ 1 (emphasis added). That statement is completely false. The Order from which Grigson purports to appeal does not, at any point, certify a class. So, it is not surprising that Grigson does not—and cannot—cite any part of the Order of Preliminary Approval ("Preliminary Approval Order") to support his claim that it "certified" the settlement class action in this case.

The Preliminary Approval Order, on its face, neither certifies nor refuses to certify a class, as demonstrated in the Settling Parties' Motion to Dismiss (the arguments of which are incorporated here by reference). Instead, the Preliminary Approval Order expressly recognizes that the settlement classes were certified in 2003, in an order that was subsequently affirmed by the Texas Supreme Court and

this Court. *See* Motion to Stay, Ex. A: Order of Preliminary Approval (July 6, 2016) at 2, ¶ 2 (explaining that the district court "has **previously** certified" the settlement classes at issue (emphasis added)); *see also Farmers Grp., Inc. v. Lubin*, 222 S.W.3d 417, 420, 427-28 (Tex. 2007) (upholding authority of Texas Attorney General to assert class claims under the Insurance Code); *Lubin v. Farmers Grp., Inc.*, No. 03-03-00374-CV, 2009 WL 3682602, at *26-32 (Tex. App.—Austin Nov. 6, 2009, no pet.) (considering and rejecting intervenors' objections to certification of the settlement classes in this case). Those long-ago certified settlement classes have remained unchanged for the past 12 years.

These facts are fatal to the Motion to Stay. Texas law is clear that an interlocutory appeal is permitted only from an order that "certifies or refuses to certify a class in a suit brought under Rule 42." *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(3). The order Grigson attempts to appeal didn't do that. The clear lack of appellate jurisdiction over Grigson's attempted appeal also requires denial of Grigson's Motion to Stay. With no basis to appeal, Grigson has no basis to stay the proceedings in this case, nor is he entitled to block class notice.

## II. Whether the Final Hearing Occurs as Scheduled Has No Bearing on Whether Class Notice Should Be Stayed

Grigson also argues, without explanation, that due to his "appeal" the final fairness hearing in this case cannot be held as scheduled, and thus, the issuance of class notice "will misinform and confuse the putative class and interfere with [the]

Court's jurisdiction." Motion to Stay at 2, ¶ 2. Once again, that is simply not the case.

The final fairness hearing can go forward as scheduled if this Court considers and grants the Settling Parties' Motion to Dismiss on an expedited basis, which would render Grigson's Motion to Stay baseless and moot. But, even if the final hearing cannot occur on the currently scheduled date for whatever reason, the Preliminary Approval Order deals expressly with that possibility, such that a stay is unnecessary. Under the Preliminary Approval Order, the district court "expressly retains the power to adjourn" the hearing without any further notice. Motion to Stay, Ex. A: Order of Preliminary Approval (July 6, 2016) at 9, ¶ 15. The Class Notice that has been approved by the district court and will be sent to absent class members also expressly informs class members that the date of the final fairness hearing may be moved. In a paragraph clearly labeled "When and where will the Court decide whether to approve the Settlement?" the approved class notice identifies the currently scheduled date and then states that the "Settlement Hearing . . . may be moved to a different date or time without additional notice" and advises class members to visit the settlement website or to call a toll-free phone number to check for any changes to the hearing date. Motion to Stay, Ex. A: Order of Preliminary Approval (July 6, 2016) at Ex. 1, p.9, ¶ 21. The sending of Class Notice therefore would neither "misinform" nor "confuse" class members, as Grigson claims. *See* Motion to Stay at 2, ¶ 2. To the contrary, the Class Notice

is designed, as a required and necessary step of the settlement approval process, to benefit absent class members by informing them of the existence and the material terms of the settlement and by triggering the ability of the members to participate, be heard, and make their own decisions about the settlement.[3] And, as is common in class action cases, they are informed of the currently scheduled date for the final fairness hearing as well as the fact that the date could change.[4]

### III. Class Notice Will Be Paid by the Defendants-Appellees Farmers Parties and Will Have No Adverse or Irreparable Effect on Class Members

Grigson's final argument in support of his Motion to Stay is that, should he somehow succeed on the merits of his interlocutory appeal of the Preliminary Approval Order, sending class notice will be a "waste of policyholder money." Motion to Stay at 3, ¶ 3. And yet again, Grigson's conclusory and unsupported argument is readily shown to be untrue.

First, Grigson's theory that sending notice would be a "waste of policyholder money" is premised on the assumption that notice would have to be re-sent, in the event the Court considers his appeal and the date for the fairness hearing has to be moved. But, as explained above, the Class Notice already contemplates the potential for moving that hearing date, and notifies class

---

[3] *See* TEX. INS. CODE § 541.266; TEX. R. CIV. P. 42(e)(1)(B).

[4] There are many non-appellate reasons why a final hearing would need to be rescheduled after the issuance of class notice (*e.g.*, court conflict, work or personal conflict of an attorney, natural disaster, etc.) but that does not mean that, in each of those situations, the entire class notice is defective and must be re-sent.

members that it may be moved. Thus, the costs of sending out notice would not be wasted in this case, even if the date of the fairness hearing ultimately is moved.

Second, Grigson's claim that the costs of notice "will be paid with policyholder money" such that sending the notice would somehow injure policyholders, *see* Motion to Stay at 3, ¶ 3,[5] is thoroughly refuted by the undisputed evidentiary record upon which the district court based its Preliminary Approval Order. It is undisputed that the costs of notice are being paid by the Farmers Parties. Grigson's argument is that the Farmers Exchanges are reciprocal insurance exchanges which are "owned" by the policyholders, such that the Exchanges' surplus funds out of which certain costs will be paid are (he claims) "policyholder money."[6] The evidence is clear and undisputed, however, that policyholders do not have ownership rights over the surplus of the Exchanges. Instead—as established through the testimony and declaration of Ron Myhan, Chief Financial Officer of the Farmers Exchanges, both of which are part of the record—policyholders of the Exchanges, like Grigson, do not "possess" the surplus

---

[5] Grigson's reference to this Court's 2003 stay order (Ex. C to Grigson's Motion to Stay) is inapposite because, as this Court will recall, the appellants at the time were appealing the district court's decision to certify the settlement classes, and the primary issue before the Court at that time was whether the Attorney General could bring and certify this class action at all without naming individual class members as representatives. *See Lubin v. Farmers Grp., Inc.*, 222 S.W.3d 417, 420 (Tex. 2007).

[6] Appellees Farmers Insurance Exchange, Fire Insurance Exchange, and Truck Insurance Exchange are the "Farmers Exchanges" or "Exchanges," which are reciprocal or interinsurance exchanges that insure the policies. TEX. INS. CODE ANN. § 942.001, *et seq*.

funds of the Exchanges. Ex. 1, 7/2/2015 Hearing Tr. 50:7-51:14; Ex. 3 at 27, Farmers Defs.' Ex. 11 ¶ 8.[7]

Moreover, despite being given ample opportunity in both his briefing and at the preliminary approval hearing, Grigson has failed to substantiate his allegation that payments by the Exchanges will adversely affect policyholders. Instead, that unsupported contention is again refuted by evidence in the record. The Exchanges have a $5.6 *billion* surplus. Ex. 1, 7/2/2015 Hearing Tr. 53:13-15. Grigson's argument that incurring the cost of approximately $2.5 million to send out class notice would somehow negatively impact policyholders is facially absurd. In any event, the Settling Parties demonstrated—through the testimony of David Mattax, the Texas Commissioner of Insurance; the declarations and testimony of the Exchanges' CFO, Ron Myhan; and other evidence offered in support of preliminary approval—that even the Exchanges' payment of the $84.6 million settlement from reserves set aside from their $5.6 billion surplus will have *no* material adverse effect on surplus, rates, or the class members who are currently policyholders of the Exchanges. *See* Ex. 2, 7/1/2015 Hearing Tr. 97:7-98:7, 101:1-104:6; Ex. 1, 7/2/2015 Hearing Tr. 46:9-51:18, 53:13-55:8; Ex. 3, Portion of Exhibits from Preliminary Approval Hearing. If payment of the $84.6 million

---

[7] Myhan also testified that, in addition to the Exchanges, Defendant-Appellee Farmers Group, Inc. will be paying a portion of the class notice costs, just as it will be reimbursing the Exchanges for a portion of the settlement amount. Ex. 1, 7/2/2015 Hearing Tr. 26:15-30:3. Grigson does not contend that money paid by Farmers Group, Inc. is "policyholder money."

settlement will not materially affect policyholders, then there can be no question that the $2.577 million in estimated class notice costs (only 3% of the settlement value, and less than 0.05% of the value of the Exchanges' surplus) will have no adverse effect on policyholders either.

It is instead Grigson's Motion for Stay—premised on a groundless interlocutory appeal and incorrect, conclusory arguments—that will adversely affect the approximately 1.8 million class members who have effectively been shut out of the settlement approval process for the past 12 years, receiving neither notice that the settlement exists nor the opportunity to participate and be heard. No more delay in this 12-year case should be allowed. Grigson had the full opportunity to participate at the preliminary approval hearing, and he failed in his opposition—a failure that is not appealable. The other absent class members are now due class notice and entitled to be informed as soon as practicable.

## CONCLUSION

For all these reasons, the Court should deny Appellant Grigson's Emergency Motion to Stay the Sending of Class Notice. The Settling Parties request all other relief to which they are justly entitled.

Date: July 20, 2015                Respectfully submitted,

/s/ *M. Scott Incerto*
Marcy Hogan Greer
State Bar No. 08417650
mgreer@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON & TOWNSEND LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Telephone: (512) 482-9300
Facsimile: (512) 482-9303

M. Scott Incerto
State Bar No. 10388950
scott.incerto@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
Telephone: 512-474-5201
Telecopier: 512-536-4598

Darryl W. Anderson
State Bar No. 24008694
darryl.anderason@nortonrosefulbright.com
Geraldine W. Young
State Bar No. 24084134
geraldine.young@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: 713-651-5151
Telecopier: 713-651-5246

**ATTORNEYS FOR APPELLEES FIRE UNDERWRITERS ASSOCIATION, FARMERS GROUP, INC., FARMERS UNDERWRITERS ASSOCIATION, FARMERS INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, TEXAS FARMERS INSURANCE COMPANY, MID-CENTURY INSURANCE COMPANY OF TEXAS, MID-CENTURY INSURANCE COMPANY, FARMERS TEXAS COUNTY MUTUAL INSURANCE COMPANY, TRUCK INSURANCE EXCHANGE, TRUCK UNDERWRITERS ASSOCIATION**

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ROBERT O'KEEFE
Division Chief
Financial Litigation, Tax, and Charitable Trusts Division

 /s/ *Joshua R. Godbey*
JOSHUA R. GODBEY
Assistant Attorney General
LEAD ATTORNEY
State Bar No. 24049996
Telephone: (512) 475-4209
joshua.godbey@texasattorneygeneral.gov
RYAN S. MINDELL
Assistant Attorney General
State Bar No. 24089707
Telephone: (512) 936-1721
ryan.mindell@texasattorneygeneral.gov
JENNIFER S. JACKSON
Assistant Attorney General
State Bar No. 24060004
Telephone: (512) 463-9917
jennifer.jackson@texasattorneygeneral.gov
Financial Litigation, Tax, and Charitable Trusts Division
P.O. Box 12548
Austin, Texas  78711-2548
Fax: (512) 477-2348)

**ATTORNEYS FOR PLAINTIFFS-APPELLEES, THE STATE OF TEXAS, THE TEXAS DEPARTMENT OF INSURANCE, AND THE TEXAS COMMISSIONER OF INSURANCE**

**CERTIFICATE OF SERVICE**

On July 20, 2015, I electronically filed the Appellees' Joint Response to Appellant Grigson's Emergency Motion to Stay the Sending of Class Notice with the Clerk of the Court using the eFile.TXCourts.gov electronic filing system which will send notification of such filing to the following (unless otherwise noted below).

Joe K. Longley
Philip K. Maxwell
1609 Shoal Creek Blvd. # 100
Austin, TX 78701
Joe@JoeLongley.com
phil@philmaxwell.com

*Counsel for Appellant Charles O. "Chuck" Grigson*

Joseph C. Blanks
P.O. Box 999
Doucette, TX 75942
blanxlex@gmail.com

*Counsel for Intervenor Gerald and Lesly Hooks*

Michael J. Woods
8620 N. New Braunfels, Ste. 522
San Antonio, TX 78217
MichaelJWoods@sbcglobal.net

*Pro Se Intervenor/Objector*

/s/ *M. Scott Incerto*
M. Scott Incerto

-11-

**CERTIFICATE OF COMPLIANCE WITH TEX. R. APP. P. 9.4(i)**

I certify that the foregoing document contains 1,754 words and complies with the word limit set forth in Texas Rule of Appellate Procedure 9.4(i).

/s/ *M. Scott Incerto*
*M. Scott Incerto*

**In the Third Court of Appeals**
**Austin, Texas**

**CHARLES O. "CHUCK" GRIGSON,**
*Appellant,*

**v.**

**THE STATE OF TEXAS; THE TEXAS DEPARTMENT OF**
**INSURANCE; THE TEXAS COMMISSIONER OF INSURANCE;**
**and FARMERS GROUP, INC., ET AL.,**
*Appellees.*

On Appeal from the 261st Judicial District Court
Travis County, Texas
Cause No. GV-202501

**APPENDIX TO**
**APPELLEES' JOINT RESPONSE TO APPELLANT GRIGSON'S**
**EMERGENCY MOTION TO STAY THE SENDING OF CLASS NOTICE**

**Exhibit 1**    7/2/2015 Preliminary Approval Hearing Transcript (certified)

**Exhibit 2**    7/1/2015 Preliminary Approval Hearing Transcript (certified)

**Exhibit 3**    A Portion of the Exhibits from the Hearing on Preliminary
Approval:  State/Plaintiff's Exhibits 10, 11, and 12 and Farmers
Defendants' Exhibits' 11, 12, and 18 (certified)

# Exhibit 1

**TO APPELLEES' JOINT RESPONSE TO APPELLANT GRIGSON'S
EMERGENCY MOTION TO STAY THE SENDING OF CLASS NOTICE**

REPORTER'S RECORD
VOLUME 2 OF 2 VOLUMES
TRIAL COURT CAUSE NO. D-1-GV-02-002501

STATE OF TEXAS, THE TEXAS ) IN THE DISTRICT COURT
DEPARTMENT OF INSURANCE, )
AND THE TEXAS )
COMMISSIONER OF )
INSURANCE, )
      Plaintiffs, )
       )
VS. )
       )
       )
FARMERS GROUP, INC., )
FARMERS UNDERWRITERS ) TRAVIS COUNTY, TEXAS
ASSOCIATION, FIRE )
UNDERWRITERS ASSOCIATION, )
FARMERS INSURANCE )
EXCHANGE, FIRE INSURANCE )
EXCHANGE, TEXAS FARMERS )
INSURANCE COMPANY, )
MID-CENTURY INSURANCE )
COMPANY OF TEXAS, AND )
FARMERS TEXAS COUNTY )
MUTUAL INSURANCE COMPANY, )
      Defendants. ) 261ST JUDICIAL DISTRICT

-----------------------------------------------------

HEARING ON JOINT MOTION FOR
PRELIMINARY APPROVAL OF SECOND AMENDED
SETTLEMENT AGREEMENT

-----------------------------------------------------

On the 2nd day of July, 2015, the following

proceedings came on to be heard in the above-entitled

and numbered cause before the Honorable Scott H.

Jenkins, Judge presiding, held in Austin, Travis County,

Texas;

Proceedings reported by machine shorthand.

**A P P E A R A N C E S**

FOR THE PLAINTIFFS, THE STATE OF TEXAS, THE TEXAS DEPARTMENT OF INSURANCE, AND THE TEXAS COMMISSIONER OF INSURANCE:

    JOSHUA GODBEY
    SBOT NO. 24049996
    RYAN MINDELL
    SBOT NO. 24089707
    JENNIFER JACKSON
    SBOT NO. 24060004
    Assistant Attorney General
    OFFICE OF THE ATTORNEY GENERAL
    P.O. Box 12548
    Austin, Texas  78711-2548
    (512) 475-4209


FOR DEFENDANTS FIRE UNDERWRITERS ASSOCIATION, FARMERS GROUP, INC., FARMERS INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, TEXAS FARMERS INSURANCE COMPANY, MID-CENTURY INSURANCE COMPANY OF TEXAS, MID-CENTURY INSURANCE COMPANY, FARMERS TEXAS COUNTY MUTUAL INSURANCE COMPANY, TRUCK INSURANCE EXCHANGE, AND TRUCK UNDERWRITERS ASSOCIATION:

    M. SCOTT INCERTO
    SBOT NO. 10388950
    NORTON ROSE FULBRIGHT
    98 San Jacinto Boulevard, Suite 1100
    Austin, Texas  78701
    (512) 474-5201

    DARRYL ANDERSON
    SBOT NO. 24008694
    NORTON ROSE FULBRIGHT
    1301 McKinney, Suite 5100
    Houston, Texas  77010-3095
    (713) 651-5151

    MARCY HOGAN GREER
    SBOT NO. 08417650
    ALEXANDER, DUBOSE, JEFFERSON & TOWNSEND
    515 Congress Avenue, Suite 2350
    Austin, Texas  78701
    (512) 482-9300

**A P P E A R A N C E S**
**(CONTINUED)**


FOR INTERVENORS GERALD HOOKS AND LESLY HOOKS:

    JOSEPH BLANKS
    SBOT NO. 02456770
    LAW OFFICE OF JOSEPH C. BLANKS
    P.O. Box 999
    Doucette, Texas  75942
    (409) 837-9707


FOR INTERVENOR MICHAEL J. WOODS:

    MICHAEL J. WOODS, PRO SE
    8620 N. New Braunfels #522
    San Antonio, Texas  78217
    (210) 822-1560


FOR INTERVENOR CHARLES O. "CHUCK" GRIGSON:

    JOE K. LONGLEY
    SBOT NO. 12542000
    LAW OFFICE OF JOE K. LONGLEY
    1609 Shoal Creek Boulevard, Suite 100
    Austin, Texas  78701
    (512) 477-4444

    PHILIP K. MAXWELL
    SBOT NO. 13254000
    LAW OFFICE OF PHILIP K. MAXWELL
    1609 Shoal Creek Boulevard, Suite 100
    Austin, Texas  78701
    (512) 947-5434

**I N D E X**

**VOLUME 2**

**HEARING ON JOINT MOTION FOR
PRELIMINARY APPROVAL OF SECOND AMENDED
SETTLEMENT AGREEMENT**

**JULY 2, 2015**

<u>**DEFENDANT FARMERS' WITNESSES**</u>

|  | Direct | Cross | Vol. |
|---|---|---|---|
| RONALD MYHAN | | | |
| By Mr. Incerto | 5 | | 2 |
| By Mr. Mindell | | 51 | 2 |
| By Mr. Maxwell | | 56 | 2 |
| By Mr. Incerto | 105 | | 2 |

|  | Page | Vol. |
|---|---|---|
| Defendants Farmers rest................... | 107 | 2 |
| All parties close....................... | 107 | 2 |
| Statements by Mr. Blanks (in lieu of opening statements earlier)........... | 108 | 2 |
| Statements by Mr. Woods.................. | 109 | 2 |
| Statements by Ms. Greer.................. | 110 | 2 |
| Court's Ruling.......................... | 116 | 2 |
| Adjournment............................. | 135 | 2 |
| Court Reporter's Certificate............. | 136 | 2 |

A. Of course the Exchanges, you know, write the policies, bill the insureds, and we have -- we receive the premium payments in cash, and they were put in the surplus. So we were thinking, okay, if we have the cash and if the Department of Insurance thinks we're 12 to 18 percent overcharging and we've settled at 6.8, we will return part of that 12 to 18 percent in terms of the 6.8 to the policyholders since we're holding the money to start with.

Q. And then anything over 6.8 percent that's actually, at least in the view of the State, to be excessive will be retained by the Exchanges; is that correct?

A. Yes, it will.

Q. One of the terms in the 2015 supplement of the settlement agreement is that FGI will reimburse the Exchanges for attorney-in-fact fees that it collected on these returned premiums.

A. Of course.

Q. Are you familiar with that?

A. Yes, I am.

Q. Do you believe that's fair?

A. Of course.

Q. Now, this term is in the 2015 agreement. My question is, is this something that had been discussed

before 2014, 2015?

A. Yeah, briefly, only because it was assumed from day one that the management fee would be returned for these premiums.

Q. What do you mean by day one?

A. Right when we were negotiating the settlement going, okay, this is what it is, I think we were actually thinking that this would be -- you know, it was such a process to get to a settlement considering, you know, the environment at that time, we figured this would be paid out pretty quickly and we were making plans, okay, this is how it gets taken out of premium, returned to the policyholders, and at the same time the management fee gets returned, so it was kind of a given that it would be returned. It wasn't debated at all.

Q. I want to make sure, are we talking about the 2002 time period with the original settlement?

A. Yes.

Q. Because we're dealing with such a long period of time, I guess I need to ask you to be as specific as you can with these times.

A. Absolutely.

Q. So there were discussions you're saying between the Exchanges and FGI regarding returning the management fee in connection with the original settlement?

A. Yes.

Q. Had any amount been specifically calculated at that time?

A. Not the amount, but the understanding was -- it was just like we do with all the other lines of business. I mean, you go back to that. The line of business that's affected, get the management fee for that line of business and cal -- it's generally a math exercise. Just calculate the management fee on the settlement amount of premium, and that's the amount that comes back.

Q. Mr. Myhan, with respect to the current settlement, has the amount of attorney-in-fact fees to be reimbursed by FGI on the return premiums been calculated?

A. Yes, it has.

Q. Who would -- who supervised that calculation?

A. That'd be me.

Q. And with respect to that calculation, can you share with us what you determined is the amount of fees to be reimbursed for the return of premiums?

A. Yes. We've calculated 8.4 million, you know, with the current settlement that's out there.

Q. Okay. Now, is that a number that includes expenses for class administration as well as a number

that includes a portion of the fund that's set out to fund the credit usage notice class?

A.    Absolutely.  As the supplement was being discussed with the board, talking in terms of the extra -- even though the extra 10 million isn't a return of premium per se and, you know, some of these other elements aren't returns of premium, the board and the audit committee as we were discussing it going, well, this is really -- we're just sharing this with FGI in terms of, okay, put this behind us and, you know, moving on and running a profitable business in Texas, and so, you know, why doesn't -- why shouldn't FGI participate in each element of this?  And we go, yeah, that's a good idea.  And there was no pushback from FGI once I went to them and said, hey, this is what we're thinking, and they go okay.

So, you know -- so basically the $10 million, supplemental payment, thicker notice amount, the administrative costs, all that that were just a part of the management fee to each to kind of give a placeholder in terms of each group participating in the outcome here.  So that gives you the 8.4 million when you get all done with all those components.

Q.    Technically class administration does not return a premium, but is there some contribution being

made there?

A.  Yes.  We're just applying the management fee to each of the amounts even if they're not premium related.

Q.  Can you tell me how you calculated the amount of management fee to be returned?

A.  Basically, for the homeowners book during these years, the management fee was -- over this period was 9.17 percent.  And so basically we're applying that rate, you know, specific to the line of business to, you know, the settlement here.

Q.  Mr. Leaman testified in 2003 that the overall management fee for that year was about 11 percent.  Do you recall that testimony?

A.  Yes, I do.

Q.  And is that accurate in your view?

A.  Yes, it is.  We had actually a year or so before this reduced just the homeowners management fee.  Really as the Texas mold started to accelerate, you know, FGI wanted to help the Exchanges' capital position somewhat, so we reduced -- they reduced it a bit there.  Plus we have -- you know, I think Stephen Leaman quoted the overall management fee, so we have other books of business that have different management fees.  So, for example, you know, the commercial book requires a lot more management company touching.  It's

But the other two really don't have any hard and fast like leverage ratio type of things, but generally they would like us to kind of keep the surplus notes about at the level they're at now.

THE COURT: So back when you were at the 2 billion to 2.7 billion ratio -- 2 billion of which was notes right?

THE WITNESS: Uh-huh.

THE COURT: Did your notes get downgraded?

THE WITNESS: They -- we were -- yeah, we were in conversations with all three rating agencies at the time, and yeah, we were getting downgrades from all three during 2002, 2003.

THE COURT: Just wanted to make sure I understood this. Go ahead.

Q. (BY MR. INCERTO) Mr. Myhan, you mentioned earlier that gross written premium today is about 18 billion.

A. Uh-huh.

Q. Is that a good number for 2014?

A. Yes, it is.

Q. How much -- how many billions in claims did the Exchanges pay out in 2014?

A. Well, each year it kind of varies based on what's happening, but if we -- you know, we've been

averaging right about 100 combined ratio for the enterprise over this last few years, and so that would be 11 to 12 billion of claims paid each year, plus two to three billion of loss adjustment expense, the claims adjusters' salaries. It also includes legal expenses, things like that. Probably about 3 billion in agents' commissions, and then expenses too, but -- you know, so big numbers.

Q. How would you characterize the financial strength of the Exchanges today compared to 2002?

A. Oh, we're much, much stronger.

Q. In your opinion as CFO, will payment of the settlement in this case have any material impact on the Exchanges' ability to pay claims?

A. No, absolutely not.

Q. Will it have any material impact on the overall financial strength of the Exchanges?

A. No, it will not.

Q. Will it have any material impact on its ratings?

A. No. It's too small.

Q. Will it have any material impact -- or will it have any impact in terms of increasing rates for policyholders?

A. Well, as we heard yesterday, you know,

obviously it won't from our perspective, but it would be impossible to actually have that happen since it's based on -- you know, we file our rates based on the claims experience and then we try to project what those losses will be going forward and then come up with a premium amount that would cover that, and this doesn't affect losses -- I mean, it doesn't affect premium -- I'm sorry. It doesn't affect losses at all. And even if you did have a way to do that, this is a regulated industry where it's -- you know, that element would never be allowed by any of the regulators.

Q. When this case arose in 2002 and settlement discussions ensued, did the Exchanges set up a reserve for the costs that they were projecting or estimating going forward?

A. Yeah, at that time we thought this would be settled fairly quickly. So once a settlement was reached in principle, we went ahead and set up a reserve at that time.

Q. What was the estimated amount of reserve?

A. I believe that was around $73 million, something in that ballpark.

Q. Okay. My question is -- I want to talk to you about reserves. Is there a difference between reserves that are set by the Exchanges written in connection with

claims that are filed by policyholders versus reserves set up on a lawsuit like this?

A. Oh, very much so. The reserves set up for claims, et cetera is kind of just a matter of operations really. The claims reps out in the field, you know, they're busy working every day to pay claims. It rolls through our systems, you know, the paids and the reserves that they're setting up. And then our actuaries look at those patterns and try to predict, okay, what are the losses that haven't been reported yet but have been incurred, and it's kind of a math exercise. It gives us -- and that's the preponderance of our -- I think we have about 8 billion of those types of reserves sitting out there now.

The legal reserves are kind of more of a -- you know, separately more judgment. For us it's kind of -- you know, we abide by the statutory accounting principles. That's what the Exchanges are governed by. So it becomes a discussion, is this probable and measurable in terms of what this is. And for us it has to be, you know, fairly material. We don't want to keep track of, you know, a thousand different cases, so we try to say, okay, anything, you know, that's material, say if it's going to hit us for maybe more than five million dollars, let's kind of

set up a reserve for that. And that's -- you know, this was a -- this was a big one and a high profile one, so, you know, we went ahead and set up a reserve for this. Really, you know, my group sets it up by discussing with the legal department in terms of what we think it's going to be.

Q. Are the reserves separate from the surplus?

A. Yes. So we set a reserve up and we incur that expense when we set up the reserve, and it comes out of surplus at that time. So this -- that initial reserve came out of 2002 or 2003 surplus. And then when the amendment came along we bumped the reserve up for the amount that it's at now, and it came out of the 2014 surplus I guess, just the extra for the 10 million and the other stuff.

Q. So what would be the impact on the surplus? Let's assume with me that this settlement is paid in four months' time. What would be the impact on the surplus?

A. If it's the amount that's in the amendment right now, there would be no impact to surplus. It's been fully reserved.

Q. Are the policyholders owners of the Exchanges?

A. In a sense they are.

Q. In what sense?

A.   In a sense where upon liquidation their claims get paid first and, you know, they would, you know, be in line there as owners of the Exchanges.  They also have a voice in electing the board of governors as their representatives to represent them as policyholders of the Exchanges.

Q.   Can a policyholder of the Exchanges decide that they want to possess a portion of the surplus?  Is that possible?

A.   No.  They pay their premiums.  And, you know, so it's a little different if you're -- if you think of ownership you think of like I own stock in a company or something, where if there's a big loss your stock would be worth pennies on the dollar or something.  Well, here you pay your premium and, you know, if we have, you know, a billion-dollar catastrophe, you know, we don't ask you for money back.  It's just, yep, you paid your premium and, you know, but that's the extent of your liability really.

Q.   If a subscriber to the Exchanges decides to go purchase insurance from a different company and not from the Exchanges --

A.   What?  Oh, okay.

Q.   -- can they continue?  Do they have any further rights in the surplus or access to the Exchanges upon

termination in their insurance contract?

A. No. Once they move on they're no longer affiliated. They're no longer a member of the Exchanges.

Q. Do they have continued liability to the Exchanges?

A. No, they do not.

Q. With respect to homeowners and auto policyholders of the Exchanges, do they receive dividends from the surplus?

A. Not for auto and fire, no.

Q. Do they have any rights to borrow against or to somehow take advantage of the increase in surplus?

A. No, they do not.

Q. In your opinion as CFO, does payment of this settlement by the Exchanges affect in any material way the policyholders' interest in the surplus?

A. It will not.

MR. INCERTO: I'll pass the witness, Your Honor.

**CROSS-EXAMINATION**

BY MR. MINDELL:

Q. Mr. Myhan, you mentioned earlier that you lose money in the arbitrage between your reserve notes and your investments on that money. Why is that?

A. Well, the surplus notes are so deeply subordinated they go into a bit of a premium. Now, if we had to actually go into the markets during 2002, there would have been a whopping premium or probably nobody would have bought them at all because of our financial ratings were under fire at the time.

But in a stable market like it is now, we're -- we have a lot of capital. The rating agencies have given us good ratings. So when people look to buy these notes from us now, you know, we'd get a better deal on them. But it still is going to be more than what we could actually invest those proceeds in.

For example, the Exchanges always have a -- you know, we've always had a very conservative investment philosophy, so our duration generally, which means -- you know, we invest in bonds that are three years in duration roughly, so we don't make any big bets on things going either way, and so these notes are longer duration, so they cost a little more, plus they're subordinated. So the difference between what we invested in and what we're paying in interest, there's always a difference.

Q. And why are your surplus investments so conservative?

A. You know, generally we keep -- you know, going

back to 2002 as an example, you know, that was also a time during a lot of the turmoil in investment markets. The tech bubble had just burst. There was lots of things going on. So we're aware of that, so we -- you know, we kind of model our investments in terms of long horizons in terms of what's possible, good and bad. And so we -- for that reason we don't make hedging -- we don't make any big bets on something happening or not. We kind of hedge our bets and keep a very conservative profile, which got us through 2008 in fine fashion, where a lot of our peers had significant impairments and had some problems.

Q. You mentioned there's approximately 5.6 billion in the surplus now. Is that across all the Exchanges?

A. Yes, that's all three Exchanges added together.

Q. And why do the Exchanges pool their surplus?

A. Well, the Exchanges all participate in a pooling of interest reinsurance arrangement. We started that in 1985. So it allows each of the Exchanges and all of our subsidiaries, by the way, who participate in the pooling agreement to have a mix of business which includes all the Farmers business. So not to get into any accountant geek stuff here, because I do have some sympathy for my audience, and people would be taking their own lives if I got into detail on this, but --

THE COURT: It just diversifies your risk.

THE WITNESS: Yes. We add all the premiums together at Farmers Exchange and then it gets ceded out to the pooling participants. So each of the Exchanges, no matter what they write on a direct basis, end up with a mix of business that includes auto and home and some commercial. For example, in Texas, if we didn't have that in place, the companies in Texas would have long been bankrupt, but they were able to cede all these losses into the pool, and, you know, Farmers Insurance of Ohio picked up some, Farmers Insurance of Washington picked up some, the three Exchanges picked up some. It diluted it, so we were able to keep them all together.

So it dilutes the risk and also helps us manage the capital, because then you don't have -- like the Texas companies would have been, you know, belly up at that point. It actually costs us money to move money around in terms of dividends and different things. There's taxes to be paid and things. So it's a more efficient way of also managing the capital for all the entities. And you can see it in the rating agencies where they rate the Farmers pool and then give the same rating to all -- you know, they have a big list of all the companies and just go down the list and give them

all the same rating because that's the rating of the Farmers pool. Does that make sense to everybody?

THE COURT: It probably helps in selling the notes, too, doesn't it?

THE WITNESS: Yes. Yeah, it makes it easier and more transparent to figure out what we're doing.

THE COURT: I get it.

Q. (BY MR. MINDELL) You testified a lot about the challenges that some of the Exchanges faced in 2002 and 2003. Were the Exchanges ever in any danger of liquidation during that time?

A. We were very close, yes, if this would have kept going. In our discussions with the California Insurance Department, there was an understanding that if our risk based capital levels -- I'm going to throw out some accounting geek stuff here, but if it fell below 250 percent, we could probably count on them denying interest to the bondholders, and that's -- what that is is like they have a minimum level of capital for your liquidated, and we needed two and a half times that at least to stay in business for the surplus notes, and we ended I think 2002 with Farmers Exchange at a 251 percent RBC level, and that was after we had initiated a quota share program to take some of the

**REPORTER'S CERTIFICATE**

THE STATE OF TEXAS    )

COUNTY OF TRAVIS      )

I, Chavela V. Crain, Official Court Reporter in and for the 53rd District Court of Travis County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered in evidence by the respective parties.

WITNESS MY OFFICIAL HAND this the 12th day of July, 2015.

                    */s/ Chavela V. Crain*
                    Chavela V. Crain
                    Texas CSR 3064, RMR, CRR
                    Expiration Date:  12/31/2015
                    Official Court Reporter
                    53rd District Court
                    Travis County, Texas
                    P.O. Box 1748
                    Austin, Texas 78767
                    (512) 854-9322

# Exhibit 2

**TO APPELLEES' JOINT RESPONSE TO APPELLANT GRIGSON'S EMERGENCY MOTION TO STAY THE SENDING OF CLASS NOTICE**

REPORTER'S RECORD
VOLUME 1 OF 2 VOLUMES
TRIAL COURT CAUSE NO. D-1-GV-02-002501

STATE OF TEXAS, THE TEXAS ) IN THE DISTRICT COURT
DEPARTMENT OF INSURANCE, )
AND THE TEXAS )
COMMISSIONER OF )
INSURANCE, )
      Plaintiffs, )
)
VS. )
)
)
FARMERS GROUP, INC., )
FARMERS UNDERWRITERS ) TRAVIS COUNTY, TEXAS
ASSOCIATION, FIRE )
UNDERWRITERS ASSOCIATION, )
FARMERS INSURANCE )
EXCHANGE, FIRE INSURANCE )
EXCHANGE, TEXAS FARMERS )
INSURANCE COMPANY, )
MID-CENTURY INSURANCE )
COMPANY OF TEXAS, AND )
FARMERS TEXAS COUNTY )
MUTUAL INSURANCE COMPANY, )
      Defendants. ) 261ST JUDICIAL DISTRICT

-----------------------------------------------------

HEARING ON JOINT MOTION FOR
PRELIMINARY APPROVAL OF SECOND AMENDED
SETTLEMENT AGREEMENT

-----------------------------------------------------

On the 1st day of July, 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Scott H. Jenkins, Judge presiding, held in Austin, Travis County, Texas;

Proceedings reported by machine shorthand.

**A P P E A R A N C E S**

FOR THE PLAINTIFFS, THE STATE OF TEXAS, THE TEXAS
DEPARTMENT OF INSURANCE, AND THE TEXAS COMMISSIONER OF
INSURANCE:

      JOSHUA GODBEY
      SBOT NO. 24049996
      RYAN MINDELL
      SBOT NO. 24089707
      JENNIFER JACKSON
      SBOT NO. 24060004
      Assistant Attorney General
      OFFICE OF THE ATTORNEY GENERAL
      P.O. Box 12548
      Austin, Texas   78711-2548
      (512) 475-4209


FOR DEFENDANTS FIRE UNDERWRITERS ASSOCIATION, FARMERS
GROUP, INC., FARMERS INSURANCE EXCHANGE, FIRE INSURANCE
EXCHANGE, TEXAS FARMERS INSURANCE COMPANY, MID-CENTURY
INSURANCE COMPANY OF TEXAS, MID-CENTURY INSURANCE
COMPANY, FARMERS TEXAS COUNTY MUTUAL INSURANCE COMPANY,
TRUCK INSURANCE EXCHANGE, AND TRUCK UNDERWRITERS
ASSOCIATION:

      M. SCOTT INCERTO
      SBOT NO. 10388950
      NORTON ROSE FULBRIGHT
      98 San Jacinto Boulevard, Suite 1100
      Austin, Texas   78701
      (512) 474-5201

      DARRYL ANDERSON
      SBOT NO. 24008694
      NORTON ROSE FULBRIGHT
      1301 McKinney, Suite 5100
      Houston, Texas   77010-3095
      (713) 651-5151

      MARCY HOGAN GREER
      SBOT NO. 08417650
      ALEXANDER, DUBOSE, JEFFERSON & TOWNSEND
      515 Congress Avenue, Suite 2350
      Austin, Texas   78701
      (512) 482-9300

**A P P E A R A N C E S**
**(CONTINUED)**


FOR INTERVENORS GERALD HOOKS AND LESLY HOOKS:

     JOSEPH BLANKS
     SBOT NO. 02456770
     LAW OFFICE OF JOSEPH C. BLANKS
     P.O. Box 999
     Doucette, Texas  75942
     (409) 837-9707


FOR INTERVENOR MICHAEL J. WOODS:

     MICHAEL J. WOODS, PRO SE
     8620 N. New Braunfels #522
     San Antonio, Texas  78217
     (210) 822-1560


FOR INTERVENOR CHARLES O. "CHUCK" GRIGSON:

     JOE K. LONGLEY
     SBOT NO. 12542000
     LAW OFFICE OF JOE K. LONGLEY
     1609 Shoal Creek Boulevard, Suite 100
     Austin, Texas  78701
     (512) 477-4444

     PHILIP K. MAXWELL
     SBOT NO. 13254000
     LAW OFFICE OF PHILIP K. MAXWELL
     1609 Shoal Creek Boulevard, Suite 100
     Austin, Texas  78701
     (512) 947-5434

**I N D E X**

**VOLUME 1**

**HEARING ON JOINT MOTION FOR
PRELIMINARY APPROVAL OF SECOND AMENDED
SETTLEMENT AGREEMENT**

**JULY 1, 2015**

|  | **Page** | **Vol.** |
|---|---|---|
| Announcements............................ | 25 | 1 |

**INTERVENOR GRIGSON'S WITNESSES**

|  | **Direct** | **Cross** | **Vol.** |
|---|---|---|---|
| PATRICK KEEL | | | |
|     By Mr. Maxwell | 33 | | 1 |

|  | **Page** | **Vol.** |
|---|---|---|
| Opening Statement by Mr. Godbey.......... | 60 | 1 |
| Opening Statement by Mr. Woods........... | 78 | 1 |

**PLAINTIFF STATE'S WITNESSES**

|  | **Direct** | **Cross** | **Vol.** |
|---|---|---|---|
| DAVID MATTAX | | | |
|     By Mr. Godbey | 83 | | 1 |
|     By Mr. Incerto | | 99 | 1 |
|     By Mr. Longley | | 106 | 1 |

**I N D E X**
**VOLUME 1 - CONTINUED**

**HEARING ON JOINT MOTION FOR**
**PRELIMINARY APPROVAL OF SECOND AMENDED**
**SETTLEMENT AGREEMENT**

**JULY 1, 2015**

**DEFENDANT FARMERS' WITNESSES**

|                          | Direct | Cross | Vol. |
|--------------------------|--------|-------|------|
| SHANNON WHEATMAN         |        |       |      |
| By Ms. Greer             | 160    |       | 1    |
| By Mr. Maxwell           |        | 174   | 1    |
| By Mr. Blanks            |        | 189   | 1    |
| By Ms. Greer             | 200    |       | 1    |
| By Mr. Maxwell           |        | 202   | 1    |
| By Mr. Blanks            |        | 217   | 1    |

**PLAINTIFF STATE'S WITNESSES**

|                          | Direct | Cross | Vol. |
|--------------------------|--------|-------|------|
| DAVID MATTAX (CONTINUED) |        |       |      |
| By Mr. Longley           |        | 219   | 1    |
| By Mr. Blanks            |        | 252   | 1    |
| By Mr. Woods             |        | 266   | 1    |
| By Mr. Incerto           |        | 283   | 1    |
| By Mr. Longley           |        | 290   | 1    |
| By Mr. Woods             |        | 295   | 1    |

|                                        | Page | Vol. |
|----------------------------------------|------|------|
| Adjournment.............................. | 300  | 1    |
| Court Reporter's Certificate.............. | 301  | 1    |

**VOLUME 1 - CONTINUED**


**ALPHABETICAL WITNESS INDEX**

| | Direct | Cross | Vol. |
|---|---|---|---|
| KEEL, PATRICK | | | |
| By Mr. Maxwell | 33 | | 1 |
| MATTAX, DAVID | | | |
| By Mr. Godbey | 83 | | 1 |
| By Mr. Incerto | | 99 | 1 |
| By Mr. Longley | | 106 | 1 |
| MATTAX, DAVID (CONTINUED) | | | |
| By Mr. Longley | | 219 | 1 |
| By Mr. Blanks | | 252 | 1 |
| By Mr. Woods | | 266 | 1 |
| By Mr. Incerto | | 283 | 1 |
| By Mr. Longley | | 290 | 1 |
| By Mr. Woods | | 295 | 1 |
| WHEATMAN, SHANNON | | | |
| By Ms. Greer | 160 | | 1 |
| By Mr. Maxwell | | 174 | 1 |
| By Mr. Blanks | | 189 | 1 |
| By Ms. Greer | 200 | | 1 |
| By Mr. Maxwell | | 202 | 1 |
| By Mr. Blanks | | 217 | 1 |

break now.  How's that sound?

THE COURT:  Okay.  I'd like a break now, so we'll all break now for 15 minutes.

(Recess taken)

THE COURT:  You may resume.

MR. GODBEY:  Thank you, Your Honor.

Q.  (BY MR. GODBEY)  Commissioner Mattax, will the payment of this settlement have any effect on the amount of premiums the Exchanges can charge in the future?

A.  No.

Q.  Why not?

A.  Premiums are determined on a prospective basis, so anything that this settlement does with respect to payment of claims will not be able to be recouped, if you will, in a future rate increase.

Q.  Are the Exchanges now subject to rate regulation in the state of Texas?

A.  Yes.

Q.  Can you briefly explain what that means?

A.  Well, in Texas you have what's called a file and use system, which means you can file your rates and use them, but the commissioner of insurance can disapprove of those rates.  And so the Department of Insurance regularly reviews rates, and if they have issues with them, it lets the companies know.  So the

companies can either withdraw their rates or file new rates that are more in conformance with what the TDI actuaries think are appropriate.

Q. Is there any way for a rate regulated entity to use a settlement payment such as this to increase rates in the future?

A. No, that would not be permitted.

Q. Commissioner Mattax, were you in the courtroom when Mr. Woods gave his opening statement?

A. For some of it, yes. I was aware that I was about to testify, so I ran out real quick.

Q. Did you hear Mr. Woods make a claim that one of his concerns with the settlement is that the prospective rate reduction that has already been given by Farmers to policyholders does not also include the return of management fee that has been negotiated in the supplement?

A. Well, if it was a prospective rate reduction, there wouldn't be a management fee collected because the rates wouldn't have been charged, so I don't think I understand the argument. You're talking about the prospective rate reduction that's already occurred.

Q. That's correct.

A. Right.

Q. The concern that Mr. Woods seems to have

**REPORTER'S CERTIFICATE**

THE STATE OF TEXAS   )

COUNTY OF TRAVIS     )

I, Chavela V. Crain, Official Court Reporter in and for the 53rd District Court of Travis County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered in evidence by the respective parties.

WITNESS MY OFFICIAL HAND this the 13th day of July, 2015.

*/s/ Chavela V. Crain*
Chavela V. Crain
Texas CSR 3064, RMR, CRR
Expiration Date:  12/31/2015
Official Court Reporter
53rd District Court
Travis County, Texas
P.O. Box 1748
Austin, Texas 78767
(512) 854-9322

*

# Exhibit 3

**TO APPELLEES' JOINT RESPONSE TO APPELLANT GRIGSON'S
EMERGENCY MOTION TO STAY THE SENDING OF CLASS NOTICE**

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
TRIAL COURT CAUSE NO. D-1-GV-02-002501

STATE OF TEXAS, THE TEXAS ) IN THE DISTRICT COURT
DEPARTMENT OF INSURANCE, )
AND THE TEXAS )
COMMISSIONER OF )
INSURANCE, )
     Plaintiffs, )
     )
VS. )
     )
FARMERS GROUP, INC., )
FARMERS UNDERWRITERS )
ASSOCIATION, FIRE ) TRAVIS COUNTY, TEXAS
UNDERWRITERS ASSOCIATION, )
FARMERS INSURANCE )
EXCHANGE, FIRE INSURANCE )
EXCHANGE, TEXAS FARMERS )
INSURANCE COMPANY, )
MID-CENTURY INSURANCE )
COMPANY OF TEXAS, AND )
FARMERS TEXAS COUNTY )
MUTUAL INSURANCE COMPANY, )
     Defendants. ) 261ST JUDICIAL DISTRICT

-----------------------------------------------------

A PORTION OF THE EXHIBITS FROM
THE HEARING ON JOINT MOTION FOR
PRELIMINARY APPROVAL OF SECOND AMENDED
SETTLEMENT AGREEMENT
(STATE/PLAINTIFF'S EXHIBITS 10, 11 AND 12
AND FARMERS DEFENDANTS' 11, 12 AND 18)

-----------------------------------------------------

On the 1st day of July, 2015, the following

proceedings came on to be heard in the above-entitled

and numbered cause before the Honorable Scott H.

Jenkins, Judge presiding, held in Austin, Travis County,

Texas;

Proceedings reported by machine shorthand.

**A P P E A R A N C E S**

FOR THE PLAINTIFFS, THE STATE OF TEXAS, THE TEXAS DEPARTMENT OF INSURANCE, AND THE TEXAS COMMISSIONER OF INSURANCE:

    JOSHUA GODBEY
    SBOT NO. 24049996
    RYAN MINDELL
    SBOT NO. 24089707
    JENNIFER JACKSON
    SBOT NO. 24060004
    Assistant Attorney General
    OFFICE OF THE ATTORNEY GENERAL
    P.O. Box 12548
    Austin, Texas  78711-2548
    (512) 475-4209


FOR DEFENDANTS FIRE UNDERWRITERS ASSOCIATION, FARMERS GROUP, INC., FARMERS INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, TEXAS FARMERS INSURANCE COMPANY, MID-CENTURY INSURANCE COMPANY OF TEXAS, MID-CENTURY INSURANCE COMPANY, FARMERS TEXAS COUNTY MUTUAL INSURANCE COMPANY, TRUCK INSURANCE EXCHANGE, AND TRUCK UNDERWRITERS ASSOCIATION:

    M. SCOTT INCERTO
    SBOT NO. 10388950
    NORTON ROSE FULBRIGHT
    98 San Jacinto Boulevard, Suite 1100
    Austin, Texas  78701
    (512) 474-5201

    DARRYL ANDERSON
    SBOT NO. 24008694
    NORTON ROSE FULBRIGHT
    1301 McKinney, Suite 5100
    Houston, Texas  77010-3095
    (713) 651-5151

    MARCY HOGAN GREER
    SBOT NO. 08417650
    ALEXANDER, DUBOSE, JEFFERSON & TOWNSEND
    515 Congress Avenue, Suite 2350
    Austin, Texas  78701
    (512) 482-9300

**A P P E A R A N C E S**
**(CONTINUED)**


FOR INTERVENORS GERALD HOOKS AND LESLY HOOKS:

    JOSEPH BLANKS
    SBOT NO. 02456770
    LAW OFFICE OF JOSEPH C. BLANKS
    P.O. Box 999
    Doucette, Texas  75942
    (409) 837-9707


FOR INTERVENOR MICHAEL J. WOODS:

    MICHAEL J. WOODS, PRO SE
    8620 N. New Braunfels #522
    San Antonio, Texas  78217
    (210) 822-1560


FOR INTERVENOR CHARLES O. "CHUCK" GRIGSON:

    JOE K. LONGLEY
    SBOT NO. 12542000
    LAW OFFICE OF JOE K. LONGLEY
    1609 Shoal Creek Boulevard, Suite 100
    Austin, Texas  78701
    (512) 477-4444

    PHILIP K. MAXWELL
    SBOT NO. 13254000
    LAW OFFICE OF PHILIP K. MAXWELL
    1609 Shoal Creek Boulevard, Suite 100
    Austin, Texas  78701
    (512) 947-5434

**VOLUME 1**

**EXHIBIT INDEX**

| STATE/PLAINTIFF'S NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 10 | Jurat; Assets; Liabilities, Surplus and Other Funds; and Statement of Income pages from the 2014 Annual Statement of Fire Insurance Exchange filed with the Texas Department of Insurance | 31 | 32 | 1 |
| 11 | Jurat; Assets; Liabilities, Surplus and Other Funds; and Statement of Income pages from the 2014 Annual Statement of Farmers Insurance Exchange filed with the Texas Department of Insurance | 31 | 32 | 1 |
| 12 | Jurat; Assets; Liabilities, Surplus and Other Funds; and Statement of Income pages from the 2014 Annual Statement of Truck Insurance Exchange filed with the Texas Department of Insurance | 31 | 32 | 1 |

**VOLUME 1 - CONTINUED**

**EXHIBIT INDEX - CONTINUED**

**FARMERS DEFENDANTS'**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|-----|-------------|---------|----------|------|
| 11 | Declaration of R. Myhan, May 29, 2015 (Exhibit to Farmers' Reply in Support of Joint Motion for Preliminary Approval) | 30 | 31 | 1 |
| 12 | TDI Reports on Surplus of Farmers Exchanges (Exhibit to Farmers' Reply in Support of Joint Motion for Preliminary Approval) | 30 | 31 | 1 |
| 18 | Declaration of Samuel Issacaroff (Exhibit to Farmers' Reply in Support of Joint Motion for Preliminary Approval) | 30 | 31 | 1 |

STATE OF TEXAS    )

COUNTY OF TRAVIS )

 

I, Chavela V. Crain, Official Court Reporter in and for the 53rd District Court of Travis County, State of Texas, do hereby certify that the following exhibits constitute true and complete duplicates of the original exhibits, excluding physical evidence, offered into evidence during the Hearing on Joint Motion for Preliminary Approval of Second Amended Settlement Agreement in the above-entitled and numbered cause as set out herein before the Honorable Scott Jenkins, Judge of the 53rd District Court of Travis County, State of Texas, occurring on July 1 and 2, 2015.

WITNESS MY OFFICIAL HAND on this the 16th day of July, 2015.

 

*/s/ Chavela V. Crain*
Chavela V. Crain
Texas CSR 3064, RMR, CRR
Expiration Date:  12/31/2015
Official Court Reporter
53rd District Court
Travis County, Texas
P.O. Box 1748
Austin, Texas 78767
(512) 854-9322

State/Plaintiff's Exhibit 10



# Texas Department of Insurance

Financial Regulation Division - Financial Analysis Section, Mail Code 303-1A
333 Guadalupe • P. O. Box 149104, Austin, Texas 78714-9104
512-676-6885 telephone • 512-490-1008 fax • www.tdi.texas.gov

STATE OF TEXAS      §
                      §
COUNTY OF TRAVIS    §

The Commissioner of Insurance, as the chief administrative and executive officer and custodian of records of the Texas Department of Insurance has delegated to the undersigned the authority to certify the authenticity of documents filed with or maintained by or within the custodial authority of the Financial Analysis Section of the Texas Department of Insurance.

Therefore, I hereby certify that the attached document is a true and correct copy of the document described below. I further certify that the document described below is filed with or maintained by or within the custodial authority of the Financial Analysis Section of the Texas Department of Insurance.

The certified document consists of a complete copy of pages 1, 2, 3, and 4 of the Annual Statement, filed by FIRE INSURANCE EXCHANGE, as of December 31, 2014.

IN TESTIMONY WHEREOF, witness my hand and seal of office at Austin, Texas, this 24th day of June, 2015.

DAVID C. MATTAX
COMMISSIONER OF INSURANCE

BY: _____

AMY GARCIA
ASSISTANT CHIEF ANALYST
FINANCIAL ANALYSIS

**EXHIBIT**

**10**



PROPERTY AND CASUALTY COMPANIES - ASSOCIATION EDITION

# ANNUAL STATEMENT
### FOR THE YEAR ENDED DECEMBER 31, 2014
### OF THE CONDITION AND AFFAIRS OF THE

# FIRE INSURANCE EXCHANGE, FIRE UNDERWRITERS ASSOCIATION, ATTORNEY-IN-FACT

NAIC Group Code    0069 (Current)    0069 (Prior)    NAIC Company Code   21660   Employer's ID Number   95-6285715

Organized under the Laws of    California    , State of Domicile or Port of Entry    California

Country of Domicile:    United States of America

Incorporated/Organized    11/10/1942     Commenced Business    11/20/1942

Statutory Home Office    4680 Wilshire Boulevard (Street and Number)    Los Angeles, CA, US 90010 (City or Town, State, Country and Zip Code)

Main Administrative Office    4680 Wilshire Boulevard (Street and Number)

Los Angeles, CA, US 90010 (City or Town, State, Country and Zip Code)    323-932-3200 (Area Code) (Telephone Number)

Mail Address:    P.O. Box 4402 (Street and Number or P.O. Box)    Woodland Hills, CA, US 91365 (City or Town, State, Country and Zip Code)

Primary Location of Books and Records    4680 Wilshire Boulevard (Street and Number)

Los Angeles, CA, US 90010 (City or Town, State, Country and Zip Code)    323-932-3441 (Area Code) (Telephone Number)

Internet Website Address:    www.farmers.com

Statutory Statement Contact:    Joseph Hammond    323-932-3441 (Area Code) (Telephone Number)

323-930-4268 (FAX Number)

## OFFICERS

President    Anthony James DeSantis*      CFO, Treasurer    Ronald Gregory Myhan

Secretary    Doren Eugene Hohl

## OTHER

Keith George Daly # Chief Claims Officer    Scott Robert Lindquist*   Vice President    Victoria Louise McCarthy* # Vice President

James Leslie Nutting*   Chief Actuary

## DIRECTORS OR TRUSTEES

| | | |
|---|---|---|
| Gissella Maria Acevedo ** | Kenneth Wayne Bentley** # | Alan Roy Gildemeister ** |
| Guy Meade Hanson** # | Gail Nanette Jackson ** | Frederick Henry Kruse ** |
| Dennis Joseph Lorch ** | Dale Anne Martin ** | Gerald Alden McElroy ** |
| Donald Eugene Rodriguez ** | Stanley Ray Smith ** | John Tsu-Chab Wuo** |

State of    California    SS:
County of    Los Angeles

The officers of this reporting entity being duly sworn, each depose and say that they are the described officers of said reporting entity, and that on the reporting period stated above, all of the herein described assets were the absolute property of the said reporting entity, free and clear from any liens or claims thereon, except as herein stated, and that this statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to, is a full and true statement of all the assets and liabilities and of the condition and affairs of the said reporting entity as of the reporting period stated above, and of its income and deductions therefrom for the period ended, and have been completed in accordance with the NAIC Annual Statement Instructions and Accounting Practices and Procedures manual except to the extent that: (1) state law may differ; or, (2) that state rules or regulations require differences in reporting not related to accounting practices and procedures, according to the best of their information, knowledge and belief, respectively. Furthermore, the scope of this attestation by the described officers also includes the related corresponding electronic filing with the NAIC, when required, that is an exact copy (except for formatting differences due to electronic filing) of the enclosed statement. The electronic filing may be requested by various regulators in lieu of or in addition to the enclosed statement.

Anthony James DeSantis*
President

Doren Eugene Hohl
Secretary

Ronald Gregory Myhan
CFO, Treasurer

Subscribed and sworn to before me this

13th   day of    February, 2015

Keith Eakins, Notary Public
November 1, 2017

*Officer of Attorney-in-Fact **Board of Governors

a. Is this an original filing?    Yes [ X ] No [   ]
b. If no,
   1. State the amendment number
   2. Date filed
   3. Number of pages attached

KEITH EAKINS
Commission # 2044162
Notary Public - California
Los Angeles County
My Comm. Expires Nov 1, 2017

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

by,
(1)    Anthony James DeSantis
   Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me,

and
(2)    Doren Eugene Hohl
   Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me,

and
(3)    Rona'd Gregory Myhan
   Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me

## ASSETS

| | | Current Year | | Prior Year |
|---|---|---|---|---|
| | 1<br>Assets | 2<br>Nonadmitted Assets | 3<br>Net Admitted Assets<br>(Cols. 1 - 2) | 4<br>Net Admitted<br>Assets |
| 1. Bonds (Schedule D) | 452,298,688 | | 452,298,688 | 651,596,142 |
| 2. Stocks (Schedule D): | | | | |
| 2.1 Preferred stocks | | | | |
| 2.2 Common stocks | 1,072,551,639 | | 1,072,551,639 | 1,014,315,368 |
| 3. Mortgage loans on real estate (Schedule B): | | | | |
| 3.1 First liens | | | | |
| 3.2 Other than first liens | | | | |
| 4. Real estate (Schedule A): | | | | |
| 4.1 Properties occupied by the company (less $ _____ encumbrances) | 364,432 | | 364,432 | 350,336 |
| 4.2 Properties held for the production of income (less $ _____ encumbrances) | | | | |
| 4.3 Properties held for sale (less $ _____ encumbrances) | 21,315 | | 21,315 | 115,147 |
| 5. Cash ($ ____225,097,688 , Schedule E - Part 1), cash equivalents ($ _____ , Schedule E - Part 2) and short-term investments ($ ____13,714,188 , Schedule DA) | 238,811,874 | | 238,811,874 | 188,058,900 |
| 6. Contract loans (including $ _____ premium notes) | | | | |
| 7. Derivatives (Schedule DB) | | | | |
| 8. Other invested assets (Schedule BA) | | | | |
| 9. Receivable for securities | | | | |
| 10. Securities lending reinvested collateral assets (Schedule DL) | | | | 5,211,300 |
| 11. Aggregate write-ins for invested assets | | | | |
| 12. Subtotals, cash and invested assets (Lines 1 to 11) | 1,764,045,949 | | 1,764,045,949 | 1,849,647,192 |
| 13. Title plants less $ _____ charged off (for Title insurers only) | | | | |
| 14. Investment income due and accrued | 3,079,000 | | 3,079,000 | 3,517,197 |
| 15. Premiums and considerations: | | | | |
| 15.1 Uncollected premiums and agents' balances in the course of collection | 28,038,559 | 5,519,429 | 22,519,130 | 17,814,755 |
| 15.2 Deferred premiums, agents' balances and installments booked but deferred and not yet due (including $ ____1,446,068 earned but unbilled premiums) | 247,093,580 | | 247,093,580 | 156,444,085 |
| 15.3 Accrued retrospective premiums | 180,957 | | 180,957 | 179,331 |
| 16. Reinsurance: | | | | |
| 16.1 Amounts recoverable from reinsurers | 187,932,474 | | 187,932,474 | 184,413,599 |
| 16.2 Funds held by or deposited with reinsured companies | | | | |
| 16.3 Other amounts receivable under reinsurance contracts | | | | |
| 17. Amounts receivable relating to uninsured plans | | | | |
| 18.1 Current federal and foreign income tax recoverable and interest thereon | 6,802,247 | | 6,802,247 | 57,158,916 |
| 18.2 Net deferred tax asset | 359,536 | | 359,536 | 17,351,970 |
| 19. Guaranty funds receivable or on deposit | 106,214 | | 106,214 | |
| 20. Electronic data processing equipment and software | | | | |
| 21. Furniture and equipment, including health care delivery assets ($ _____ ) | | | | |
| 22. Net adjustment in assets and liabilities due to foreign exchange rates | | | | |
| 23. Receivables from parent, subsidiaries and affiliates | 29,424,648 | | 29,424,648 | 172,658,882 |
| 24. Health care ($ _____ ) and other amounts receivable | | | | |
| 25. Aggregate write-ins for other than invested assets | 20,202,507 | | 20,202,507 | 15,776,270 |
| 26. Total assets excluding Separate Accounts, Segregated Accounts and Protected Cell Accounts (Lines 12 to 25) | 2,287,265,671 | 5,519,429 | 2,281,746,242 | 2,254,782,187 |
| 27. From Separate Accounts, Segregated Accounts and Protected Cell Accounts | | | | |
| 28. Total (Lines 26 and 27) | 2,287,265,671 | 5,519,429 | 2,281,746,242 | 2,254,782,187 |
| DETAILS OF WRITE-INS | | | | |
| 1101. | | | | |
| 1102. | | | | |
| 1103. | | | | |
| 1198. Summary of remaining write-ins for Line 11 from overflow page | | | | |
| 1199. Totals (Lines 1101 thru 1103 plus 1198)(Line 11 above) | | | | |
| 2501. Equities and deposits in pools and associations | 20,202,507 | | 20,202,507 | 15,776,270 |
| 2502. | | | | |
| 2503. | | | | |
| 2598. Summary of remaining write-ins for Line 25 from overflow page | | | | |
| 2599. Totals (Lines 2501 thru 2503 plus 2598)(Line 25 above) | 20,202,507 | | 20,202,507 | 15,776,270 |

# LIABILITIES, SURPLUS AND OTHER FUNDS

| | 1<br>Current Year | 2<br>Prior Year |
|---|---:|---:|
| 1. Losses (Part 2A, Line 35, Column 8) | 488,205,683 | 487,127,950 |
| 2. Reinsurance payable on paid losses and loss adjustment expenses (Schedule F, Part 1, Column 6) | 190,895,050 | 194,151,480 |
| 3. Loss adjustment expenses (Part 2A, Line 35, Column 9) | 150,363,915 | 153,740,433 |
| 4. Commissions payable, contingent commissions and other similar charges | | |
| 5. Other expenses (excluding taxes, licenses and fees) | 1,030,118 | 847,392 |
| 6. Taxes, licenses and fees (excluding federal and foreign income taxes) | 4,041,789 | 4,582,261 |
| 7.1 Current federal and foreign income taxes (including $ _____ on realized capital gains (losses)) | | |
| 7.2 Net deferred tax liability | | |
| 8. Borrowed money $ _____ and interest thereon $ _____ | | |
| 9. Unearned premiums (Part 1A, Line 38, Column 5) (after deducting unearned premiums for ceded reinsurance of $ ____2,515,382,563 and including warranty reserves of $ _____ and accrued accident and health experience rating refunds including $ _____ for medical loss ratio rebate per the Public Health Service Act) | 485,784,451 | 449,789,779 |
| 10. Advance premium | 10,473,208 | 11,094,278 |
| 11. Dividends declared and unpaid: | | |
| 11.1 Stockholders | | |
| 11.2 Policyholders | 230,743 | 230,743 |
| 12. Ceded reinsurance premiums payable (net of ceding commissions) | 200,833,301 | 213,768,504 |
| 13. Funds held by company under reinsurance treaties (Schedule F, Part 3, Column 19) | 154,005 | 1,415,002 |
| 14. Amounts withheld or retained by company for account of others | | 8,755 |
| 15. Remittances and items not allocated | | |
| 16. Provision for reinsurance (including $ _____ certified) (Schedule F, Part 8) | 599,791 | 3,778,754 |
| 17. Net adjustments in assets and liabilities due to foreign exchange rates | | |
| 18. Drafts outstanding | | |
| 19. Payable to parent, subsidiaries and affiliates | | |
| 20. Derivatives | | |
| 21. Payable for securities | 4,393,347 | |
| 22. Payable for securities lending | | 5,211,300 |
| 23. Liability for amounts held under uninsured plans | | |
| 24. Capital notes $ _____ and interest thereon $ _____ | | |
| 25. Aggregate write-ins for liabilities | (14,289,356) | 7,763,349 |
| 26. Total liabilities excluding protected cell liabilities (Lines 1 through 25) | 1,510,696,042 | 1,533,507,997 |
| 27. Protected cell liabilities | | |
| 28. Total liabilities (Lines 26 and 27) | 1,510,696,042 | 1,533,507,997 |
| 29. Aggregate write-ins for special surplus funds | — | |
| 30. Common capital stock | | |
| 31. Preferred capital stock | | |
| 32. Aggregate write-ins for other than special surplus funds | | |
| 33. Surplus notes | 160,622,050 | 159,622,050 |
| 34. Gross paid in and contributed surplus | | |
| 35. Unassigned funds (surplus) | 610,428,150 | 561,632,139 |
| 36. Less treasury stock, at cost: | | |
| 36.1 _____ shares common (value included in Line 30 $ _____ ) | | |
| 36.2 _____ shares preferred (value included in Line 31 $ _____ ) | | |
| 37. Surplus as regards policyholders (Lines 29 to 35, less 36) (Page 4, Line 39) | 771,050,200 | 721,254,189 |
| 38. TOTALS (Page 2, Line 28, Col. 3) | 2,281,746,242 | 2,254,762,187 |
| DETAILS OF WRITE-INS | | |
| 2501. Claims payments made after data-processing close | (98,403,048) | (101,943,419) |
| 2502. Uncashed drafts and checks pending escheatment | 51,568,507 | 52,390,190 |
| 2503. Accounts payable | 32,748,582 | 60,360,459 |
| 2598. Summary of remaining write-ins for Line 25 from overflow page | (201,396) | (3,043,881) |
| 2599. Totals (Lines 2501 thru 2503 plus 2598)(Line 25 above) | (14,289,356) | 7,763,349 |
| 2901. | | |
| 2902. | | |
| 2903. | | |
| 2998. Summary of remaining write-ins for Line 29 from overflow page | | |
| 2999. Totals (Lines 2901 thru 2903 plus 2998)(Line 29 above) | | |
| 3201. | | |
| 3202. | | |
| 3203. | | |
| 3298. Summary of remaining write-ins for Line 32 from overflow page | | |
| 3299. Totals (Lines 3201 thru 3203 plus 3298)(Line 32 above) | | |

# STATEMENT OF INCOME

| | 1 Current Year | 2 Prior Year |
|---|---|---|
| **UNDERWRITING INCOME** | | |
| 1. Premiums earned (Part 1, Line 35, Column 4) | 1,018,697,588 | 1,029,332,282 |
| **DEDUCTIONS:** | | |
| 2. Losses incurred (Part 2, Line 35, Column 7) | 567,730,676 | 587,187,445 |
| 3. Loss adjustment expenses incurred (Part 3, Line 25, Column 1) | 102,432,126 | 101,284,964 |
| 4. Other underwriting expenses incurred (Part 3, Line 25, Column 2) | 367,224,143 | 355,306,044 |
| 5. Aggregate write-ins for underwriting deductions | (518,175) | |
| 6. Total underwriting deductions (Lines 2 through 5) | 1,036,868,771 | 1,043,778,453 |
| 7. Net income of protected cells | | |
| 8. Net underwriting gain or (loss) (Line 1 minus Line 6 plus Line 7) | (18,171,185) | (14,446,171) |
| **INVESTMENT INCOME** | | |
| 9. Net investment income earned (Exhibit of Net Investment Income, Line 17) | 4,676,218 | 8,205,076 |
| 10. Net realized capital gains or (losses) less capital gains tax of $ 547,187 (Exhibit of Capital Gains (Losses) ) | 1,211,349 | 9,340,977 |
| 11. Net investment gain (loss) (Lines 9 + 10) | 5,887,567 | 17,546,053 |
| **OTHER INCOME** | | |
| 12. Net gain (loss) from agents' or premium balances charged off (amount recovered $ 619,785 amount charged off $ 8,299,157 ) | (7,679,372) | (7,895,232) |
| 13. Finance and service charges not included in premiums | 16,618,320 | 17,795,766 |
| 14. Aggregate write-ins for miscellaneous income | 7,136,980 | 1,193,056 |
| 15. Total other income (Lines 12 through 14) | 16,075,929 | 11,093,590 |
| 16. Net income before dividends to policyholders, after capital gains tax and before all other federal and foreign income taxes (Lines 8 + 11 + 15) | 3,792,311 | 14,193,473 |
| 17. Dividends to policyholders | 43,140 | 72,705 |
| 18. Net income, after dividends to policyholders, after capital gains tax and before all other federal and foreign income taxes (Line 16 minus Line 17) | 3,749,171 | 14,120,768 |
| 19. Federal and foreign income taxes incurred | (3,018,273) | 1,410,841 |
| 20. Net income (Line 18 minus Line 19)(to Line 22) | 6,767,444 | 12,709,927 |
| **CAPITAL AND SURPLUS ACCOUNT** | | |
| 21. Surplus as regards policyholders, December 31 prior year (Page 4, Line 39, Column 2) | 721,254,189 | 662,218,256 |
| 22. Net income (from Line 20) | 6,767,444 | 12,709,927 |
| 23. Net transfers (to) from Protected Cell accounts | | |
| 24. Change in net unrealized capital gains or (losses) less capital gains tax of $ 12,971,161 | 42,637,854 | 58,132,336 |
| 25. Change in net unrealized foreign exchange capital gain (loss) | | |
| 26. Change in net deferred income tax | (4,021,272) | 1,939,562 |
| 27. Change in nonadmitted assets (Exhibit of Nonadmitted Assets, Line 28, Col. 3) | 3,077,507 | (152,717) |
| 28. Change in provision for reinsurance (Page 3, Line 16, Column 2 minus Column 1) | 3,176,963 | (2,728,131) |
| 29. Change in surplus notes | 1,000,000 | (13,708,000) |
| 30. Surplus (contributed to) withdrawn from protected cells | | |
| 31. Cumulative effect of changes in accounting principles | | |
| 32. Capital changes: | | |
| 32.1 Paid in | | |
| 32.2 Transferred from surplus (Stock Dividend) | | |
| 32.3 Transferred to surplus | | |
| 33. Surplus adjustments: | | |
| 33.1 Paid in | | |
| 33.2 Transferred to capital (Stock Dividend) | | |
| 33.3 Transferred from capital | | |
| 34. Net remittances from or (to) Home Office | | |
| 35. Dividends to stockholders | | |
| 36. Change in treasury stock (Page 3, Lines 36.1 and 36.2, Column 2 minus Column 1) | | |
| 37. Aggregate write-ins for gains and losses in surplus | (2,842,485) | 2,842,957 |
| 38. Change in surplus as regards policyholders for the year (Lines 22 through 37) | 49,796,010 | 59,035,933 |
| 39. Surplus as regards policyholders, December 31 current year (Line 21 plus Line 38) (Page 3, Line 37) | 771,050,200 | 721,254,189 |
| **DETAILS OF WRITE-INS** | | |
| 0501. Pooled share of L/D program income | (518,175) | |
| 0502. | | |
| 0503. | | |
| 0598. Summary of remaining write-ins for Line 5 from overflow page | | |
| 0599. Totals (Lines 0501 thru 0503 plus 0598)(Line 5 above) | (518,175) | |
| 1401. Miscellaneous income | 7,136,980 | 1,193,056 |
| 1402. | | |
| 1403. | | |
| 1498. Summary of remaining write-ins for Line 14 from overflow page | | |
| 1499. Totals (Lines 1401 thru 1403 plus 1498)(Line 14 above) | 7,136,980 | 1,193,056 |
| 3701. Pooled share of unauthorized reinsurance | (2,842,485) | 2,842,957 |
| 3702. | | |
| 3703. | | |
| 3798. Summary of remaining write-ins for Line 37 from overflow page | | |
| 3799. Totals (Lines 3701 thru 3703 plus 3798)(Line 37 above) | (2,842,485) | 2,842,957 |

4

State/Plaintiff's Exhibit 11



# Texas Department of Insurance

**Financial Regulation Division - Financial Analysis Section,** Mail Code 303-1A
333 Guadalupe • P. O. Box 149104, Austin, Texas 78714-9104
512-676-6885 telephone • 512-490-1008 fax • www.tdi.texas.gov

STATE OF TEXAS     §
                      §
COUNTY OF TRAVIS   §

The Commissioner of Insurance, as the chief administrative and executive officer and custodian of records of the Texas Department of Insurance has delegated to the undersigned the authority to certify the authenticity of documents filed with or maintained by or within the custodial authority of the Financial Analysis Section of the Texas Department of Insurance.

Therefore, I hereby certify that the attached document is a true and correct copy of the document described below. I further certify that the document described below is filed with or maintained by or within the custodial authority of the Financial Analysis Section of the Texas Department of Insurance.

The certified document consists of a complete copy of pages 1, 2, 3, and 4 of the Annual Statement, filed by FARMERS INSURANCE EXCHANGE, as of December 31, 2014.

IN TESTIMONY WHEREOF, witness my hand and seal of office at Austin, Texas, this 24th day of June, 2015.

DAVID C. MATTAX
COMMISSIONER OF INSURANCE

BY: _____
AMY GARCIA
ASSISTANT CHIEF ANALYST
FINANCIAL ANALYSIS

**EXHIBIT**
**11**



# ANNUAL STATEMENT

### FOR THE YEAR ENDED DECEMBER 31, 2014
### OF THE CONDITION AND AFFAIRS OF THE

# FARMERS INSURANCE EXCHANGE, FARMERS GROUP INC., DBA:
# FARMERS UNDERWRITERS ASSOCIATION, ATTORNEY-IN-FACT

NAIC Group Code __0069__ __0069__ NAIC Company Code __21652__ Employer's ID Number __95-2575893__
(Current) (Prior)

Organized under the Laws of __California__ , State of Domicile or Port of Entry __California__

Country of Domicile __United States of America__

Incorporated/Organized __03/28/1928__ Commenced Business __04/06/1928__

Statutory Home Office __4680 Wilshire Boulevard__ , __Los Angeles , CA, US 90010__
(Street and Number) (City or Town, State, Country and Zip Code)

Main Administrative Office __4680 Wilshire Boulevard__
(Street and Number)

__Los Angeles , CA, US 90010__ , __323-932-3200__
(City or Town, State, Country and Zip Code) (Area Code) (Telephone Number)

Mail Address __P.O. Box 4402__ , __Woodland Hills , CA, US 91365__
(Street and Number or P.O. Box) (City or Town, State, Country and Zip Code)

Primary Location of Books and Records __4680 Wilshire Boulevard__
(Street and Number)

__Los Angeles , CA, US 90010__ , __323-932-3441__
(City or Town, State, Country and Zip Code) (Area Code) (Telephone Number)

Internet Website Address __www.farmers.com__

Statutory Statement Contact __Joseph Hammond__ , __323-932-3441__
(Name) (Area Code) (Telephone Number)

__323-930-4269__
(FAX Number)

## OFFICERS

President, CEO __Jeffrey John Dailey *__ CFO __Ronald Gregory Myhan__

Secretary __Doren Eugene Hohl__

## OTHER

Keith George Daly # Chief Claims Officer | Scott Robert Lindquist* CFO, Treasurer | James Leslie Nutting* Chief Actuary
Steven Henry Weinstein* General Counsel

## DIRECTORS OR TRUSTEES

| Joe David Bryant** # | Alan Roy Gildemeister** # | Frederick Henry Kruse ** |
| Dennis Joseph Lorch ** | Dale Anne Martin ** | Ronald Lee Marrone ** |
| Gary Randolph Martin ** | Donnell Reid ** | Donald Eugene Rodriguez ** |
| Stanley Ray Smith **. | Otto Joel Wallace ** | John Tsu-Chao Wuo ** |

State of __California__
County of __Los Angeles__ SS:

The officers of this reporting entity being duly sworn, each depose and say that they are the described officers of said reporting entity, and that on the reporting period stated above, all of the herein described assets were the absolute property of the said reporting entity, free and clear from any liens or claims thereon, except as herein stated, and that this statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to, is a full and true statement of all the assets and liabilities and of the condition and affairs of the said reporting entity as of the reporting period stated above, and of its income and deductions therefrom for the period ended, and have been completed in accordance with the NAIC Annual Statement Instructions and Accounting Practices and Procedures manual except to the extent that: (1) state law may differ; or, (2) that state rules or regulations require differences in reporting not related to accounting practices and procedures, according to the best of their information, knowledge and belief, respectively. Furthermore, the scope of this attestation by the described officers also includes the related corresponding electronic filing with the NAIC, when required, that is an exact copy (except for formatting differences due to electronic filing) of the enclosed statement. The electronic filing may be requested by various regulators in lieu of or in addition to the enclosed statement.

(signature) | (signature) | (signature)

Jeffrey John Dailey* | Doren Eugene Hohl | Ronald Gregory Myhan
President, CEO | Secretary | CFO, Treasurer

Subscribed and sworn to before me this
__13th__ day of __February, 2015__

(signature)

Keith Eakins, Notary Public
November 1, 2017
*Officer of Attorney-In-Fact **Board of Governors

a. Is this an original filing? ..............
b. If no,
    1. State the amendment number. .....
    2. Date filed ................
    3. Number of pages attached .........

Yes [ X ] No [ ]

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

by,

(1) __Jeffrey John Dailey__ ,
Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me,

and

(2) __Doren Eugene Hohl__ ,
Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me,

and

(3) __Ronald Gregory Myhan__ ,
Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me.

KEITH EAKINS
Commission # 2044162
Notary Public - California
Los Angeles County
My Comm. Expires Nov 1, 2017

# ASSETS

| | Current Year 1 Assets | Current Year 2 Nonadmitted Assets | Current Year 3 Net Admitted Assets (Cols. 1 - 2) | Prior Year 4 Net Admitted Assets |
|---|---|---|---|---|
| 1. Bonds (Schedule D) | 5,724,078,561 | | 5,724,078,561 | 5,857,454,108 |
| 2. Stocks (Schedule D): | | | | |
| 2.1 Preferred stocks | | | | |
| 2.2 Common stocks | 4,953,346,148 | | 4,953,346,148 | 4,450,147,747 |
| 3. Mortgage loans on real estate (Schedule B): | | | | |
| 3.1 First liens | | | | |
| 3.2 Other than first liens | | | | |
| 4. Real estate (Schedule A): | | | | |
| 4.1 Properties occupied by the company (less $ _____ encumbrances) | 63,480,271 | | 63,480,271 | 64,961,329 |
| 4.2 Properties held for the production of income (less $ _____ encumbrances) | | | | |
| 4.3 Properties held for sale (less $ _____ encumbrances) | 162,253 | | 162,253 | 981,380 |
| 5. Cash ($ _____(184,698,847), Schedule E - Part 1), cash equivalents ($ _____, Schedule E - Part 2) and short-term investments ($ _____114,161,460, Schedule DA) | (70,537,387) | | (70,537,387) | (262,543,339) |
| 6. Contract loans (including $ _____ premium notes) | | | | |
| 7. Derivatives (Schedule DB) | | | | 38,245 |
| 8. Other invested assets (Schedule BA) | 230,093,057 | | 230,093,057 | 239,287,125 |
| 9. Receivable for securities | 43,821,875 | | 43,821,875 | 1,900,046 |
| 10. Securities lending reinvested collateral assets (Schedule DL) | | | | 48,849,078 |
| 11. Aggregate write-ins for invested assets | | | | 585,160 |
| 12. Subtotals, cash and invested assets (Lines 1 to 11) | 10,944,442,778 | | 10,944,442,778 | 10,401,460,875 |
| 13. Title plants less $ _____ charged off (for Title insurers only) | | | | |
| 14. Investment income due and accrued | 45,580,823 | 1,907,738 | 43,673,085 | 45,554,837 |
| 15. Premiums and considerations: | | | | |
| 15.1 Uncollected premiums and agents' balances in the course of collection | 280,387,173 | 38,084,059 | 242,303,115 | 318,954,173 |
| 15.2 Deferred premiums, agents' balances and installments booked but deferred and not yet due (including $ _____9,977,872 earned but unbilled premiums) | 2,658,697,015 | | 2,658,697,015 | 2,832,768,906 |
| 15.3 Accrued retrospective premiums | 1,248,607 | | 1,248,607 | 1,237,387 |
| 16. Reinsurance: | | | | |
| 16.1 Amounts recoverable from reinsurers | 600,348,745 | | 600,348,745 | 642,005,215 |
| 16.2 Funds held by or deposited with reinsured companies | | | | |
| 16.3 Other amounts receivable under reinsurance contracts | | | | |
| 17. Amounts receivable relating to uninsured plans | | | | |
| 18.1 Current federal and foreign income tax recoverable and interest thereon | 185,892,562 | | 185,892,562 | 584,138,776 |
| 18.2 Net deferred tax asset | 413,845,075 | 57,969,981 | 355,875,095 | 371,872,248 |
| 19. Guaranty funds receivable or on deposit | 322,591 | | 322,591 | 391,791 |
| 20. Electronic data processing equipment and software | | | | 946,407 |
| 21. Furniture and equipment, including health care delivery assets ($ _____ ) | 22,805,416 | 22,805,416 | | |
| 22. Net adjustment in assets and liabilities due to foreign exchange rates | | | | |
| 23. Receivables from parent, subsidiaries and affiliates | 149,926,887 | | 149,926,887 | |
| 24. Health care ($ _____ ) and other amounts receivable | | | | |
| 25. Aggregate write-ins for other than invested assets | 638,033,922 | 229,457,548 | 408,576,374 | 377,797,056 |
| 26. Total assets excluding Separate Accounts, Segregated Accounts and Protected Cell Accounts (Lines 12 to 25) | 15,941,531,594 | 350,224,741 | 15,591,306,853 | 15,557,125,672 |
| 27. From Separate Accounts, Segregated Accounts and Protected Cell Accounts | | | | |
| 28. Total (Lines 26 and 27) | 15,941,531,594 | 350,224,741 | 15,591,306,853 | 15,557,125,672 |
| DETAILS OF WRITE-INS | | | | |
| 1101. Other invested assets | | | | 585,160 |
| 1102. | | | | |
| 1103. | | | | |
| 1198. Summary of remaining write-ins for Line 11 from overflow page | | | | |
| 1199. Totals (Lines 1101 thru 1103 plus 1198)(Line 11 above) | | | | 585,160 |
| 2501. Insurance-company owned life insurance-cash value | 390,591,384 | | 390,591,384 | 361,449,427 |
| 2502. Business-owned life insurance-cash value | 17,494,873 | | 17,494,873 | 16,347,629 |
| 2503. Guaranty funds recoverable/policyholder surcharges | 490,117 | | 490,117 | |
| 2598. Summary of remaining write-ins for Line 25 from overflow page | 229,457,548 | 229,457,548 | | |
| 2599. Totals (Lines 2501 thru 2503 plus 2598)(Line 25 above) | 638,033,922 | 229,457,548 | 408,576,374 | 377,797,056 |

# LIABILITIES, SURPLUS AND OTHER FUNDS

| | | 1 Current Year | 2 Prior Year |
|---|---|---|---|
| 1. | Losses (Part 2A, Line 35, Column 8) | 3,361,193,668 | 3,357,913,651 |
| 2. | Reinsurance payable on paid losses and loss adjustment expenses (Schedule F, Part 1, Column 6) | 831,964,395 | 836,826,846 |
| 3. | Loss adjustment expenses (Part 2A, Line 35, Column 9) | 1,043,763,082 | 1,068,147,430 |
| 4. | Commissions payable, contingent commissions and other similar charges | | |
| 5. | Other expenses (excluding taxes, licenses and fees) | 16,121,595 | 13,892,686 |
| 6. | Taxes, licenses and fees (excluding federal and foreign income taxes) | 13,357,832 | 13,162,182 |
| 7.1 | Current federal and foreign income taxes (including $ _____ on realized capital gains (losses)) | | |
| 7.2 | Net deferred tax liability | | |
| 8. | Borrowed money $ _____ and interest thereon $ _____ | | |
| 9. | Unearned premiums (Part 1A, Line 38, Column 5) (after deducting unearned premiums for ceded reinsurance of $ _____ 6,038,574,770 and including warranty reserves of $ _____ and accrued accident and health experience rating refunds including $ _____ for medical loss ratio rebate per the Public Health Service Act) | 3,351,774,702 | 3,103,621,789 |
| 10. | Advance premium | 72,265,123 | 76,550,520 |
| 11. | Dividends declared and unpaid: | | |
| | 11.1 Stockholders | | |
| | 11.2 Policyholders | 1,592,124 | 1,592,124 |
| 12. | Ceded reinsurance premiums payable (net of ceding commissions) | 643,705,957 | 520,637,700 |
| 13. | Funds held by company under reinsurance treaties (Schedule F, Part 3, Column 19) | 1,958,060,771 | 2,444,950,037 |
| 14. | Amounts withheld or retained by company for account of others | 2,811,749 | 3,589,936 |
| 15. | Remittances and items not allocated | 27,188,301 | 59,749,835 |
| 16. | Provision for reinsurance (including $ _____ certified) (Schedule F, Part 8) | 36,874 | 51,113 |
| 17. | Net adjustments in assets and liabilities due to foreign exchange rates | | |
| 18. | Drafts outstanding | | |
| 19. | Payable to parent, subsidiaries and affiliates | | 61,496,129 |
| 20. | Derivatives | | |
| 21. | Payable for securities | 44,836,853 | |
| 22. | Payable for securities lending | | 48,649,076 |
| 23. | Liability for amounts held under uninsured plans | | |
| 24. | Capital notes $ _____ and interest thereon $ _____ | | |
| 25. | Aggregate write-ins for liabilities | 41,177,885 | 57,173,514 |
| 26. | Total liabilities excluding protected cell liabilities (Lines 1 through 25) | 11,409,850,909 | 11,677,404,569 |
| 27. | Protected cell liabilities | | |
| 28. | Total liabilities (Lines 26 and 27) | 11,409,850,909 | 11,677,404,569 |
| 29. | Aggregate write-ins for special surplus funds | 45,649,976 | 45,649,976 |
| 30. | Common capital stock | | |
| 31. | Preferred capital stock | | |
| 32. | Aggregate write-ins for other than special surplus funds | | |
| 33. | Surplus notes | 2,004,536,999 | 1,845,472,000 |
| 34. | Gross paid in and contributed surplus | | |
| 35. | Unassigned funds (surplus) | 2,131,268,969 | 1,988,599,127 |
| 36. | Less treasury stock, at cost: | | |
| | 36.1 _____ shares common (value included in Line 30 $ _____ ) | | |
| | 36.2 _____ shares preferred (value included in Line 31 $ _____ ) | | |
| 37. | Surplus as regards policyholders (Lines 29 to 35, less 36) (Page 4, Line 39) | 4,181,455,944 | 3,879,721,103 |
| 38. | TOTALS (Page 2, Line 28, Col. 3) | 15,591,306,853 | 15,557,125,672 |
| | **DETAILS OF WRITE-INS** | | |
| 2501. | Claims payments made after data-processing close | (277,707,112) | (255,184,491) |
| 2502. | Accounts payable | 184,337,094 | 201,251,113 |
| 2503. | Uncashed drafts and checks pending escheatment | 44,818,294 | 33,190,100 |
| 2598. | Summary of remaining write-ins for Line 25 from overflow page | 89,729,609 | 77,916,792 |
| 2599. | Totals (Lines 2501 thru 2503 plus 2598)(Line 25 above) | 41,177,885 | 57,173,514 |
| 2901. | Increase due to SSAP No. 10R net deferred tax | 45,649,976 | 45,649,976 |
| 2902. | | | |
| 2903. | | | |
| 2998. | Summary of remaining write-ins for Line 29 from overflow page | | |
| 2999. | Totals (Lines 2901 thru 2903 plus 2998)(Line 29 above) | 45,649,976 | 45,649,976 |
| 3201. | | | |
| 3202. | | | |
| 3203. | | | |
| 3298. | Summary of remaining write-ins for Line 32 from overflow page | | |
| 3299. | Totals (Lines 3201 thru 3203 plus 3298)(Line 32 above) | | |

# STATEMENT OF INCOME

| | 1 Current Year | 2 Prior Year |
|---|---|---|
| **UNDERWRITING INCOME** | | |
| 1. Premiums earned (Part 1, Line 35, Column 4) | 7,029,085,663 | 7,102,421,794 |
| **DEDUCTIONS:** | | |
| 2. Losses incurred (Part 2, Line 35, Column 7) | 3,918,938,382 | 4,049,147,732 |
| 3. Loss adjustment expenses incurred (Part 3, Line 25, Column 1) | 706,464,165 | 698,131,609 |
| 4. Other underwriting expenses incurred (Part 3, Line 25, Column 2) | 2,533,848,003 | 2,452,042,572 |
| 5. Aggregate write-ins for underwriting deductions | (3,575,409) | |
| 6. Total underwriting deductions (Lines 2 through 5) | 7,155,675,141 | 7,199,321,912 |
| 7. Net income of protected cells | | |
| 8. Net underwriting gain or (loss) (Line 1 minus Line 6 plus Line 7) | (126,589,478) | (96,900,118) |
| **INVESTMENT INCOME** | | |
| 9. Net investment income earned (Exhibit of Net Investment Income, Line 17) | 74,382,580 | 102,284,808 |
| 10. Net realized capital gains or (losses) less capital gains tax of $ _____5,983,419 (Exhibit of Capital Gains (Losses) ) | 9,135,750 | (28,823,438) |
| 11. Net investment gain (loss) (Lines 9 + 10) | 83,518,330 | 73,461,370 |
| **OTHER INCOME** | | |
| 12. Net gain (loss) from agents' or premium balances charged off (amount recovered $ _____4,276,513 amount charged off $ _____57,262,763 ) | (52,986,250) | (54,046,228) |
| 13. Finance and service charges not included in premiums | 114,666,410 | 122,790,782 |
| 14. Aggregate write-ins for miscellaneous income | (73,066,439) | (41,738,727) |
| 15. Total other income (Lines 12 through 14) | (11,386,279) | 27,005,827 |
| 16. Net income before dividends to policyholders, after capital gains tax and before all other federal and foreign income taxes (Lines 8 + 11 + 15) | (54,457,426) | 3,567,079 |
| 17. Dividends to policyholders | 297,669 | 501,662 |
| 18. Net income, after dividends to policyholders, after capital gains tax and before all other federal and foreign income taxes (Line 16 minus Line 17) | (54,755,096) | 3,065,417 |
| 19. Federal and foreign income taxes incurred | (57,227,411) | (51,938,507) |
| 20. Net income (Line 18 minus Line 19)(to Line 22) | 2,472,316 | 55,003,924 |
| **CAPITAL AND SURPLUS ACCOUNT** | | |
| 21. Surplus as regards policyholders, December 31 prior year (Page 4, Line 39, Column 2) | 3,879,721,103 | 3,750,799,663 |
| 22. Net income (from Line 20) | 2,472,316 | 55,003,924 |
| 23. Net transfers (to) from Protected Cell accounts | | |
| 24. Change in net unrealized capital gains or (losses) less capital gains tax of $ _____7,725,829 | 169,505,714 | 131,146,792 |
| 25. Change in net unrealized foreign exchange capital gain (loss) | | |
| 26. Change in net deferred income tax | (8,030,794) | (16,623,126) |
| 27. Change in nonadmitted assets (Exhibit of Nonadmitted Assets, Line 28, Col. 3) | (24,444,629) | (7,361,332) |
| 28. Change in provision for reinsurance (Page 3, Line 16, Column 2 minus Column 1) | 14,239 | 33,662 |
| 29. Change in surplus notes | 159,064,999 | (36,398,000) |
| 30. Surplus (contributed to) withdrawn from protected cells | | |
| 31. Cumulative effect of changes in accounting principles | | |
| 32. Capital changes: | | |
| 32.1 Paid in | | |
| 32.2 Transferred from surplus (Stock Dividend) | | |
| 32.3 Transferred to surplus | | |
| 33. Surplus adjustments: | | |
| 33.1 Paid in | | |
| 33.2 Transferred to capital (Stock Dividend) | | |
| 33.3 Transferred from capital | | |
| 34. Net remittances from or (to) Home Office | | |
| 35. Dividends to stockholders | | |
| 36. Change in treasury stock (Page 3, Lines 36.1 and 36.2, Column 2 minus Column 1) | | |
| 37. Aggregate write-ins for gains and losses in surplus | 3,152,994 | 3,119,520 |
| 38. Change in surplus as regards policyholders for the year (Lines 22 through 37) | 301,734,840 | 128,921,440 |
| 39. Surplus as regards policyholders, December 31 current year (Line 21 plus Line 38) (Page 3, Line 37) | 4,181,455,944 | 3,879,721,103 |
| **DETAILS OF WRITE-INS** | | |
| 0501. Pooled share of LAD program income | (3,575,409) | |
| 0502. | | |
| 0503. | | |
| 0598. Summary of remaining write-ins for Line 5 from overflow page | | |
| 0599. Totals (Lines 0501 thru 0503 plus 0598)(Line 5 above) | (3,575,409) | |
| 1401. Interest expense on funds held | (69,320,922) | (69,057,841) |
| 1402. Miscellaneous (expense)/income | (2,673,128) | 28,219,498 |
| 1403. Premiums for company-owned life insurance | (883,058) | (721,673) |
| 1498. Summary of remaining write-ins for Line 14 from overflow page | (189,332) | (178,711) |
| 1499. Totals (Lines 1401 thru 1403 plus 1498)(Line 14 above) | (73,066,439) | (41,738,727) |
| 3701. Pooled share of unauthorized reinsurance | 2,302,314 | 814,429 |
| 3702. Net proceeds from company-owned life insurance | 850,680 | 2,305,091 |
| 3703. | | |
| 3798. Summary of remaining write-ins for Line 37 from overflow page | | |
| 3799. Totals (Lines 3701 thru 3703 plus 3798)(Line 37 above) | 3,152,994 | 3,119,520 |

State/Plaintiff's Exhibit 12



# Texas Department of Insurance

**Financial Regulation Division - Financial Analysis Section,** Mail Code 303-1A
333 Guadalupe • P. O. Box 149104, Austin, Texas 78714-9104
512-676-6885 telephone • 512-490-1008 fax • www.tdi.texas.gov

STATE OF TEXAS      §
                         §
COUNTY OF TRAVIS    §

The Commissioner of Insurance, as the chief administrative and executive officer and custodian of records of the Texas Department of Insurance has delegated to the undersigned the authority to certify the authenticity of documents filed with or maintained by or within the custodial authority of the Financial Analysis Section of the Texas Department of Insurance.

Therefore, I hereby certify that the attached document is a true and correct copy of the document described below. I further certify that the document described below is filed with or maintained by or within the custodial authority of the Financial Analysis Section of the Texas Department of Insurance.

The certified document consists of a complete copy of pages 1, 2, 3, and 4 of the Annual Statement, filed by TRUCK INSURANCE EXCHANGE, as of December 31, 2014.

IN TESTIMONY WHEREOF, witness my hand and seal of office at Austin, Texas, this 24th day of June, 2015.

DAVID C. MATTAX
COMMISSIONER OF INSURANCE

BY: _____
AMY GARCIA
ASSISTANT CHIEF ANALYST
FINANCIAL ANALYSIS

**EXHIBIT**

**12**



PROPERTY AND CASUALTY COMPANIES - ASSOCIATION EDITION

# ANNUAL STATEMENT
### FOR THE YEAR ENDED DECEMBER 31, 2014
### OF THE CONDITION AND AFFAIRS OF THE

# TRUCK INSURANCE EXCHANGE, TRUCK UNDERWRITERS ASSOCIATION, ATTORNEY-IN-FACT

NAIC Group Code    0069    0069    NAIC Company Code    21709    Employer's ID Number    95-2575892
(Current)   (Prior)

Organized under the Laws of _____ California _____, State of Domicile or Port of Entry _____ California
Country of Domicile _____ United States of America

Incorporated/Organized    02/05/1935            Commenced Business    02/05/1935

Statutory Home Office    4680 Wilshire Boulevard    ,    Los Angeles, CA, US 90010
(Street and Number)        (City or Town, State, Country and Zip Code)

Main Administrative Office    4680 Wilshire Boulevard
(Street and Number)

Los Angeles, CA, US 90010    ,    323-932-3200
(City or Town, State, Country and Zip Code)        (Area Code) (Telephone Number)

Mail Address    P.O. Box 4402    ,    Woodland Hills, CA, US 91365
(Street and Number or P.O. Box)        (City or Town, State, Country and Zip Code)

Primary Location of Books and Records    4680 Wilshire Boulevard
(Street and Number)

Los Angeles, CA, US 90010    ,    323-932-3441
(City or Town, State, Country and Zip Code)        (Area Code) (Telephone Number)

Internet Website Address    www.farmers.com

Statutory Statement Contact    Joseph Hammond    ,    323-932-3441
(Area Code) (Telephone Number)
323-930-4266
(FAX Number)

## OFFICERS

President    Anthony James DeSantis* #        CFO, Treasurer    Ronald Gregory Myhan
Secretary    Doren Eugene Hohl

### OTHER

Keith George Daly # Chief Claims Officer    Scott Robert Lindquist * Vice President    Victoria Louise McCarthy* # Vice President
James Leslie Nutting* Chief Actuary

### DIRECTORS OR TRUSTEES

| Kenneth Wayne Bentley ** | Frank Anthony Bonelio ** | Thomas David Brown ** |
|---|---|---|
| Joe David Bryant ** | Alan Roy Gildemeister ** | Guy Meade Hanson ** |
| Dennis Joseph Lorch ** | Ronald Lee Marrone ** | Gary Randolph Martin ** |
| Gerald Alden McElroy ** | Janice Gale Scott ** | Ottis Joel Wallace ** |

State of    California    SS:
County of    Los Angeles

The officers of this reporting entity being duly sworn, each depose and say that they are the described officers of said reporting entity, and that on the reporting period stated above, all of the herein described assets were the absolute property of the said reporting entity, free and clear from any liens or claims thereon, except as herein stated, and that this statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to, is a full and true statement of all the assets and liabilities and of the condition and affairs of the said reporting entity as of the reporting period stated above, and of its income and deductions therefrom for the period ended, and have been completed in accordance with the NAIC Annual Statement Instructions and Accounting Practices and Procedures manual except to the extent that: (1) state law may differ; or, (2) that state rules or regulations require differences in reporting not related to accounting practices and procedures, according to the best of their information, knowledge and belief, respectively. Furthermore, the scope of this attestation by the described officers also includes the related corresponding electronic filing with the NAIC, when required, that is an exact copy (except for formatting differences due to electronic filing) of the enclosed statement. The electronic filing may be requested by various regulators in lieu of or in addition to the enclosed statement.

Anthony James DeSantis*
President

Doren Eugene Hohl
Secretary

Ronald Gregory Myhan
CFO, Treasurer

Subscribed and sworn to before me this
13th    day of    February, 2015

Keith Eakins, Notary Public
November 1, 2017
*Officer of Attorney-In-Fact  **Board of Governors

a. Is this an original filing? .................    Yes [ X ]  No [   ]
b. If no,
1. State the amendment number .........
2. Date filed ...................................
3. Number of pages attached ...........

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document

by,
(1) _____ Anthony James DeSantis _____
Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me,

and

(2) _____ Doren Eugene Hohl _____
Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me,

and

(3) _____ Ronald Gregory Myhan _____
Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me.

KEITH EAKINS
Commission # 2044162
Notary Public - California
Los Angeles County
My Comm. Expires Nov 1, 2017

# ASSETS

| | | Current Year | | | Prior Year |
|---|---|---|---|---|---|
| | | 1<br>Assets | 2<br>Nonadmitted Assets | 3<br>Net Admitted Assets<br>(Cols. 1 - 2) | 4<br>Net Admitted<br>Assets |
| 1. | Bonds (Schedule D) | 855,587,573 | | 855,587,573 | 793,446,863 |
| 2. | Stocks (Schedule D): | | | | |
| | 2.1 Preferred stocks | | | | |
| | 2.2 Common stocks | 780,109,260 | | 780,109,260 | 726,896,010 |
| 3. | Mortgage loans on real estate (Schedule B): | | | | |
| | 3.1 First liens | | | | |
| | 3.2 Other than first liens | | | | |
| 4. | Real estate (Schedule A): | | | | |
| | 4.1 Properties occupied by the company (less $ _____ encumbrances) | 899,122 | | 899,122 | 862,142 |
| | 4.2 Properties held for the production of income (less $ _____ encumbrances) | | | | |
| | 4.3 Properties held for sale (less $ _____ encumbrances) | 54,457 | | 54,457 | 294,234 |
| 5. | Cash ($ _____(61,767,111) , Schedule E - Part 1), cash equivalents ($ _____ , Schedule E - Part 2) and short-term investments ($ _____14,195,596 , Schedule DA) | (47,571,515) | | (47,571,515) | (38,594,019) |
| 6. | Contract loans (including $ _____ premium notes) | | | | |
| 7. | Derivatives (Schedule DB) | | | | 11,815 |
| 8. | Other invested assets (Schedule BA) | | | | |
| 9. | Receivable for securities | 8,450,000 | | 8,450,000 | |
| 10. | Securities lending reinvested collateral assets (Schedule DL) | | | | 11,553,538 |
| 11. | Aggregate write-ins for invested assets | | | | |
| 12. | Subtotals, cash and invested assets (Lines 1 to 11) | 1,597,528,906 | | 1,597,528,906 | 1,496,470,583 |
| 13. | Title plants less $ _____ charged off (for Title insurers only) | | | | |
| 14. | Investment income due and accrued | 4,637,185 | | 4,637,185 | 3,968,743 |
| 15. | Premiums and considerations: | | | | |
| | 15.1 Uncollected premiums and agents' balances in the course of collection | 33,608,740 | 5,703,409 | 27,905,331 | 21,200,938 |
| | 15.2 Deferred premiums, agents' balances and installments booked but deferred and not yet due (including $ _____1,494,271 earned but unbilled premiums) | 306,194,250 | | 306,194,250 | 188,294,499 |
| | 15.3 Accrued retrospective premiums | 186,989 | | 186,989 | 185,309 |
| 16. | Reinsurance: | | | | |
| | 16.1 Amounts recoverable from reinsurers | 109,165,046 | | 109,165,046 | 132,064,756 |
| | 16.2 Funds held by or deposited with reinsured companies | 8,234,973 | | 8,234,973 | |
| | 16.3 Other amounts receivable under reinsurance contracts | | | | |
| 17. | Amounts receivable relating to uninsured plans | | | | |
| 18.1 | Current federal and foreign income tax recoverable and interest thereon | 19,381,819 | | 19,381,819 | 50,114,004 |
| 18.2 | Net deferred tax asset | | | | |
| 19. | Guaranty funds receivable or on deposit | 361,600 | | 361,600 | 2,657,470 |
| 20. | Electronic data processing equipment and software | | | | |
| 21. | Furniture and equipment, including health care delivery assets ($ _____ ) | | | | |
| 22. | Net adjustment in assets and liabilities due to foreign exchange rates | | | | |
| 23. | Receivables from parent, subsidiaries and affiliates | | | | 35,941,554 |
| 24. | Health care ($ _____ ) and other amounts receivable | | | | |
| 25. | Aggregate write-ins for other than invested assets | 4,768,814 | 781,539 | 3,987,275 | 2,488,233 |
| 26. | Total assets excluding Separate Accounts, Segregated Accounts and Protected Cell Accounts (Lines 12 to 25) | 2,084,068,323 | 6,484,949 | 2,077,583,374 | 1,933,396,090 |
| 27. | From Separate Accounts, Segregated Accounts and Protected Cell Accounts | | | | |
| 28. | Total (Lines 26 and 27) | 2,084,068,323 | 6,484,949 | 2,077,583,374 | 1,933,396,090 |
| | DETAILS OF WRITE-INS | | | | |
| 1101. | | | | | |
| 1102. | | | | | |
| 1103. | | | | | |
| 1198. | Summary of remaining write-ins for Line 11 from overflow page | | | | |
| 1199. | Totals (Lines 1101 thru 1103 plus 1198)(Line 11 above) | | | | |
| 2501. | Other assets | 2,476,332 | 781,539 | 1,694,792 | 1,309,798 |
| 2502. | Guaranty funds recoverable/policyholder surcharges | 1,582,347 | | 1,582,347 | |
| 2503. | Equities and deposits in pools and associations | 496,073 | | 496,073 | 1,178,435 |
| 2598. | Summary of remaining write-ins for Line 25 from overflow page | 214,062 | | 214,062 | |
| 2599. | Totals (Lines 2501 thru 2503 plus 2598)(Line 25 above) | 4,768,814 | 781,539 | 3,987,275 | 2,488,233 |

# LIABILITIES, SURPLUS AND OTHER FUNDS

| | 1 Current Year | 2 Prior Year |
|---|---|---|
| 1. Losses (Part 2A, Line 35, Column 8) | 502,739,498 | 503,687,655 |
| 2. Reinsurance payable on paid losses and loss adjustment expenses (Schedule F, Part 1, Column 6) | 132,303,150 | 148,251,220 |
| 3. Loss adjustment expenses (Part 2A, Line 35, Column 9) | 155,714,108 | 159,261,143 |
| 4. Commissions payable, contingent commissions and other similar charges | | |
| 5. Other expenses (excluding taxes, licenses and fees) | 1,064,453 | 782,025 |
| 6. Taxes, licenses and fees (excluding federal and foreign income taxes) | 2,307,744 | 616,763 |
| 7.1 Current federal and foreign income taxes (including $ _____ on realized capital gains (losses)) | | |
| 7.2 Net deferred tax liability | 25,583,652 | 9,515,240 |
| 8. Borrowed money $ _____ and interest thereon $ _____ | | |
| 9. Unearned premiums (Part 1A, Line 38, Column 5) (after deducting unearned premiums for ceded reinsurance of $ ___979,734,322 and including warranty reserves of $ _____ and accrued accident and health experience rating refunds including $ _____ for medical loss ratio rebate per the Public Health Service Act) | 501,956,599 | 464,782,772 |
| 10. Advance premium | 10,822,313 | 11,464,088 |
| 11. Dividends declared and unpaid: | | |
| 11.1 Stockholders | | |
| 11.2 Policyholders | 238,434 | 238,434 |
| 12. Ceded reinsurance premiums payable (net of ceding commissions) | 109,558,207 | 102,611,004 |
| 13. Funds held by company under reinsurance treaties (Schedule F, Part 3, Column 19) | 487,954 | 713,336 |
| 14. Amounts withheld or retained by company for account of others | 1,312,689 | 1,670,360 |
| 15. Remittances and items not allocated | | 138,855 |
| 16. Provision for reinsurance (including $ _____ certified) (Schedule F, Part 8) | 4,593,554 | 5,718,322 |
| 17. Net adjustments in assets and liabilities due to foreign exchange rates | | |
| 18. Drafts outstanding | | |
| 19. Payable to parent, subsidiaries and affiliates | 61,274,370 | |
| 20. Derivatives | | |
| 21. Payable for securities | 9,030,659 | |
| 22. Payable for securities lending | | 11,553,538 |
| 23. Liability for amounts held under uninsured plans | | |
| 24. Capital notes $ _____ and interest thereon $ _____ | | |
| 25. Aggregate write-ins for liabilities | (60,088,564) | (51,090,567) |
| 26. Total liabilities excluding protected cell liabilities (Lines 1 through 25) | 1,458,878,815 | 1,369,922,187 |
| 27. Protected cell liabilities | | |
| 28. Total liabilities (Lines 26 and 27) | 1,458,878,815 | 1,369,922,187 |
| 29. Aggregate write-ins for special surplus funds | | |
| 30. Common capital stock | | |
| 31. Preferred capital stock | | |
| 32. Aggregate write-ins for other than special surplus funds | | |
| 33. Surplus notes | 317,039,000 | 277,039,000 |
| 34. Gross paid in and contributed surplus | | |
| 35. Unassigned funds (surplus) | 301,665,559 | 286,434,903 |
| 36. Less treasury stock, at cost: | | |
| 36.1 _____ shares common (value included in Line 30 $ _____ ) | | |
| 36.2 _____ shares preferred (value included in Line 31 $ _____ ) | | |
| 37. Surplus as regards policyholders (Lines 29 to 35, less 36) (Page 4, Line 39) | 618,704,559 | 563,473,903 |
| 38. TOTALS (Page 2, Line 28, Col. 3) | 2,077,583,374 | 1,933,396,090 |
| DETAILS OF WRITE-INS | | |
| 2501. Claims payments made after data-processing close | (63,273,513) | (55,228,744) |
| 2502. Uncashed drafts and checks pending escheatment | 6,280,049 | 5,208,860 |
| 2503. Pooled share of unauthorized reinsurance | (4,181,569) | (4,960,266) |
| 2598. Summary of remaining write-ins for Line 25 from overflow page | 1,086,469 | 3,889,583 |
| 2599. Totals (Lines 2501 thru 2503 plus 2598)(Line 25 above) | (60,088,564) | (51,090,567) |
| 2901. | | |
| 2902. | | |
| 2903. | | |
| 2998. Summary of remaining write-ins for Line 29 from overflow page | | |
| 2999. Totals (Lines 2901 thru 2903 plus 2998)(Line 29 above) | | |
| 3201. | | |
| 3202. | | |
| 3203. | | |
| 3298. Summary of remaining write-ins for Line 32 from overflow page | | |
| 3299. Totals (Lines 3201 thru 3203 plus 3298)(Line 32 above) | | |

3

# STATEMENT OF INCOME

| | 1<br>Current Year | 2<br>Prior Year |
|---|---|---|
| **UNDERWRITING INCOME** | | |
| 1. Premiums earned (Part 1, Line 35, Column 4) | 1,052,654,172 | 1,063,643,358 |
| **DEDUCTIONS:** | | |
| 2. Losses incurred (Part 2, Line 35, Column 7) | 586,724,228 | 606,713,297 |
| 3. Loss adjustment expenses incurred (Part 3, Line 25, Column 1) | 105,827,745 | 104,624,284 |
| 4. Other underwriting expenses incurred (Part 3, Line 25, Column 2) | 379,464,948 | 367,149,579 |
| 5. Aggregate write-ins for underwriting deductions | (535,448) | |
| 6. Total underwriting deductions (Lines 2 through 5) | 1,071,481,473 | 1,078,487,150 |
| 7. Net income of protected cells | | |
| 8. Net underwriting gain or (loss) (Line 1 minus Line 6 plus Line 7) | (18,827,301) | (14,843,792) |
| **INVESTMENT INCOME** | | |
| 9. Net investment income earned (Exhibit of Net Investment Income, Line 17) | (1,987,627) | 1,743,317 |
| 10. Net realized capital gains or (losses) less capital gains tax of $ _____48,724 (Exhibit of Capital Gains (Losses) ) | 662,999 | 3,061,913 |
| 11. Net investment gain (loss) (Lines 9 + 10) | (1,324,628) | 4,805,230 |
| **OTHER INCOME** | | |
| 12. Net gain (loss) from agents' or premium balances charged off (amount recovered $ _____640,444  amount charged off $ _____8,575,795 ) | (7,935,351) | (8,158,408) |
| 13. Finance and service charges not included in premiums | 17,172,264 | 18,388,958 |
| 14. Aggregate write-ins for miscellaneous income | (2,953,164) | (2,759,564) |
| 15. Total other income (Lines 12 through 14) | 6,283,749 | 7,470,987 |
| 16. Net income before dividends to policyholders, after capital gains tax and before all other federal and foreign income taxes (Lines 8 + 11 + 15) | (13,868,179) | (2,567,574) |
| 17. Dividends to policyholders | 44,578 | 75,128 |
| 18. Net income, after dividends to policyholders, after capital gains tax and before all other federal and foreign income taxes (Line 16 minus Line 17) | (13,912,758) | (2,642,702) |
| 19. Federal and foreign income taxes incurred | (6,598,172) | (4,145,897) |
| 20. Net Income (Line 18 minus Line 19)(to Line 22) | (7,314,586) | 1,503,195 |
| **CAPITAL AND SURPLUS ACCOUNT** | | |
| 21. Surplus as regards policyholders, December 31 prior year (Page 4, Line 39, Column 2) | 563,473,903 | 534,962,646 |
| 22. Net Income (from Line 20) | (7,314,586) | 1,503,195 |
| 23. Net transfers (to) from Protected Cell accounts | | |
| 24. Change in net unrealized capital gains or (losses) less capital gains tax of $ _____13,600,944 | 21,518,686 | 21,819,611 |
| 25. Change in net unrealized foreign exchange capital gain (loss) | | |
| 26. Change in net deferred income tax | (2,467,468) | 3,250,928 |
| 27. Change in nonadmitted assets (Exhibit of Nonadmitted Assets, Line 28, Col. 3) | 3,147,953 | (222,999) |
| 28. Change in provision for reinsurance (Page 3, Line 16, Column 2 minus Column 1) | 1,124,768 | 3,640,897 |
| 29. Change in surplus notes | 40,000,000 | 2,039,000 |
| 30. Surplus (contributed to) withdrawn from protected cells | | |
| 31. Cumulative effect of changes in accounting principles | | |
| 32. Capital changes: | | |
| 32.1 Paid in | | |
| 32.2 Transferred from surplus (Stock Dividend) | | |
| 32.3 Transferred to surplus | | |
| 33. Surplus adjustments: | | |
| 33.1 Paid in | | |
| 33.2 Transferred to capital (Stock Dividend) | | |
| 33.3 Transferred from capital | | |
| 34. Net remittances from or (to) Home Office | | |
| 35. Dividends to stockholders | | |
| 36. Change in treasury stock (Page 3, Lines 36.1 and 36.2, Column 2 minus Column 1) | | |
| 37. Aggregate write-ins for gains and losses in surplus | (778,697) | (3,519,375) |
| 38. Change in surplus as regards policyholders for the year (Lines 22 through 37) | 55,230,656 | 28,511,258 |
| 39. Surplus as regards policyholders, December 31 current year (Line 21 plus Line 38) (Page 3, Line 37) | 618,704,559 | 563,473,903 |
| **DETAILS OF WRITE-INS** | | |
| 0501. Pooled share of L/D program income | (535,448) | |
| 0502. | | |
| 0503. | | |
| 0598. Summary of remaining write-ins for Line 5 from overflow page | | |
| 0599. Totals (Lines 0501 thru 0503 plus 0598)(Line 5 above) | (535,448) | |
| 1401. Miscellaneous expense | (2,953,164) | (2,759,564) |
| 1402. | | |
| 1403. | | |
| 1498. Summary of remaining write-ins for Line 14 from overflow page | | |
| 1499. Totals (Lines 1401 thru 1403 plus 1498)(Line 14 above) | (2,953,164) | (2,759,564) |
| 3701. Pooled share of unauthorized reinsurance | (778,697) | (3,519,375) |
| 3702. | | |
| 3703. | | |
| 3798. Summary of remaining write-ins for Line 37 from overflow page | | |
| 3799. Totals (Lines 3701 thru 3703 plus 3798)(Line 37 above) | (778,697) | (3,519,375) |

4

Farmers Defendants' Exhibit 11

NO. GV-202501

| THE STATE OF TEXAS AND TEXAS COMMISSIONER OF INSURANCE, | § § § | IN THE DISTRICT COURT |
|---|---|---|
| Plaintiffs, | § § | |
| v. | § § | OF TRAVIS COUNTY |
| FARMERS GROUP, INC., ET AL. | § § § | |
| Defendants. | § § § | 261st JUDICIAL DISTRICT |

## DECLARATION OF RONALD MYHAN

STATE OF CALIFORNIA      §
                                   §
COUNTY OF LOS ANGELES    §

1. My name is Ronald Myhan, my date of birth is March 27, 1954, and my business address is 6301 Owensmouth Ave., Woodland Hills, California, 91367, USA.

2. I am the Chief Financial Officer of Farmers Insurance Exchange, Fire Insurance Exchange, and Truck Insurance Exchange (collectively, "the Farmers Exchanges"). I am not an employee of Farmers Group, Inc. ("FGI"). In my role with the Farmers Exchanges, I am familiar and interact regularly with the three Boards of Governors of each of the Farmers Exchanges ("Boards of Governors"), as well as the Farmers Exchanges Audit Committee ("Audit Committee").

3. None of the Governors on the Boards of Governors and on the Audit Committee are or can be current directors, officers, agents, employees, or shareholders of FGI, any attorney-in-fact of a Farmers Exchange, or any entities under common ownership with FGI or an attorney-in-fact.

4. The Audit Committee is a joint committee created by resolution of the Boards of Governors and, under its Charter, is authorized to review significant legal matters involving the Farmers Exchanges. I am familiar with the Audit Committee's actions taken with regard to the above-captioned matter ("Texas Litigation"), including the approval of the settlement entered into by the Farmers Exchanges in the Texas Litigation.

5. The Farmers Exchanges have been advised by the law firm of Locke Lord LLP ("Locke Lord") for over 10 years on insurance-related matters, including Locke Lord's representation of the Farmers Exchanges in the matter of *Fogel v. FGI, et al.*, No. BC300142, in the Superior Court of the State of California.

1 of 3

Farmers
Defendants'
Exhibit
11
No. D-1-GV-02-002501

6.  Advised by Locke Lord, the Audit Committee conducted a review of the Second Amended Settlement Agreement and Stipulation and the 2015 Supplement to the Second Amended Settlement Agreement and Stipulation ("2015 Supplement"). The Audit Committee passed a resolution approving the settlement and authorizing me, as the Chief Financial Officer of the Farmers Exchanges, to sign the final version of the 2015 Supplement if not materially different than what was presented to the Committee. A true and correct copy of that resolution is attached hereto as Appendix A. Under that authority, I signed the 2015 Supplement to the Second Amended Settlement Agreement and Stipulation on behalf of the Farmers Exchanges.

7.  As the Chief Financial Officer of the Farmers Exchanges, I am familiar with the current finances of the Farmers Exchanges. The current pooled surplus of the Farmers Exchanges is approximately $5.6 billion. The surplus has grown by $ 2.9 billion since 2002 through April 2015. The surplus has also grown in relation to the amount of premium written. The ratio between premium and surplus has risen since 2002, from 26.3% in 2002 to 38.6% in 2015.

8.  Policyholders of the Farmers Exchanges do not have the power to personally possess or transmit any portion of the Farmers Exchanges' surplus. A member of the Farmers Exchanges may not sell his or her policy to another person and does not earn any capital gains resulting from increases in the surplus during the time of ownership. The Farmers Exchanges do not pay out dividends to their homeowner or auto policyholders. Should a policyholder cancel or non-renew coverage through the Farmers Exchanges, thus ceasing to be an Exchange member, the policyholder is not entitled to take with him or her any portion of the surplus.

9.  Litigation reserves for the settlement in the Texas Litigation were established in 2003 and have been updated periodically over the years. These reserve amounts are not included in the reported surplus for the Exchanges. Payment of the settlement amounts will have no material impact on the Farmers Exchanges' ability to pay future policyholder claims.

10. The Farmers Exchanges' settlement payment in the Texas Litigation will not be factored into future rates and will not result in any changes to the Farmers Exchanges' rates. In simple terms, the Exchanges' rates are based on a forward projection of the premium needed to cover future anticipated losses and expenses. The settlement amounts in this case are largely a return of premiums previously paid to the Farmers Exchanges by policyholders. One-time reimbursement expenses of this nature have no impact on anticipated future claims and are not used in calculating future rates.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED in Los Angeles County, State of California, on the 29th day of May, 2015.

RONALD MYHAN

# FARMERS EXCHANGES AUDIT COMMITTEE
## CERTIFIED COPY OF RESOLUTIONS

WHEREAS, the Committee's Charter specifies that the Committee shall review material litigation of the Exchanges and their subsidiaries;

WHEREAS, the Committee has been provided with the background and status of The State of Texas, et. al v Farmers Group, Inc., et al, a Texas class action as well as other related cases and regulatory matters (hereinafter referred to as 'Texas v. Farmers'), by the General Counsel and by outside counsel;

NOW, THEREFORE, BE IT RESOLVED, that the Committee hereby acknowledges receipt of the Second Amended Settlement Agreement and Stipulation, the Supplement to the Second Amended Settlement Agreement and Stipulation (the "Settlement") and other documents relative to Texas v. Farmers;

BE IT FURTHER RESOLVED, that the Committee hereby approves the Settlement in substantially the form as submitted to the Committee; and

BE IT FURTHER RESOLVED, that the Chief Financial Officer of the Exchanges is authorized on behalf of the Exchanges and their subsidiaries to sign the final version of the Settlement so long as the final version of the Settlement is not materially different than what was presented to the Committee.

## CERTIFICATION

I, Doren E. Hohl, do hereby certify that I am the duly elected, qualified and acting Secretary of Farmers Insurance Exchange and its subsidiaries and affiliates, including its Audit Committee, and that the foregoing is a full, true and correct copy of resolutions adopted on January 28, 2015 by the Farmers Exchanges Audit Committee, and the resolutions are in full force and effect as of the date of this certification.

In witness whereof, I have signed this instrument this 27th day of February, 2015.

_____
Doren E. Hohl
Secretary

Appendix A to Declaration of R. Myhan

1584960  S020MTD015  15-38777

Farmers Defendants' Exhibit 12

## Texas Department of Insurance

333 Guadalupe St. P.O. Box 149104 Austin, TX 78714-9104

# FARMERS INSURANCE EXCHANGE

Skip over these navigation links.

Show Explanation of Terms

Table of Contents

General Info | Contact Info | Types of Insurance | Use of Credit | Attorney for Service | Ratings | Financial Info | Premiums | Complaint Ratios | Company History | Company Officers

## General Information:

Return to top.

| | |
|---|---|
| Type of Entity: | Reciprocal (RE) |
| Status of TX License: | Active |
| Company Status: | Normal Operations |
| License Number: | 27800 |
| NAIC Number: | 21652 |
| TDI Company Number: | 27800 |
| FEIN: | 952575893 |
| Home City/State: | CA |
| Origin: | Foreign |
| Date Incorporated/Organized: | 04/19/1928 |
| Date Licensed/Eligible/Registered in Texas: | 03/10/1936 |
| Date Cancelled/Ineligible/Inactive: | |

## Contact Information:

Return to top.

| | |
|---|---|
| Mailing Address: | P O Box 2478 Terminal Annex<br>Los Angeles CA 90051 |
| Office Number: | (323)932-3200 |
| Toll Free Number: | (800)327-6377 |
| Fax Number: | (323)930-4266 |
| | |
| Physical Address: | 4680 Wilshire Blvd<br>Los Angeles CA 90010 |
| Office Number: | |
| Toll Free Number: | |
| Fax Number: | |

Farmers
Defendants'
Exhibit
12
No. D-1-GV-02-002501

# Types of Insurance Licensed to Write:

Return to top.

- Accident
- Aircraft Liability
- Aircraft Physical Damage
- Allied Coverages
- Auto Physical Damage
- Automobile Liability
- Boiler & Machinery
- Burglary & Theft
- Fidelity & Surety
- Fire
- Glass
- Health
- Inland Marine
- Liability Other than Auto
- Livestock
- Reinsurance All Lines
- Workers Comp and Emp Liability

# Use of Credit:

Return to top.

To determine if a company uses credit information for private passenger automobile or homeowners insurance.

| Click Here for Use of Credit |

# Attorney for Service:

Return to top.

| Click Here for Attorney for Service Guidelines |

Chris Granger
15700 Long Vista Drive
Austin TX 78728 -3822

# Rating By Financial Organization:

Return to top.

The following organizations rate insurance companies on their financial strength and stability. Some of these companies charge for their services.

A.M. Best
Weiss Ratings Inc.
Standard & Poor's
Moody's Investors Service
Fitch IBCA, Duff and Phelps Ratings

# Financial Information:

Return to top.

| As of: | Dec. 31, 2012 | Dec. 31, 2013 | Dec. 31, 2014 |
|---|---|---|---|
| Total Assets | $15,530,166,955 | $15,557,125,672 | $15,591,306,853 |
| Total Liabilities | $11,779,367,292 | $11,677,404,569 | $11,409,850,909 |
| Asset to Liability Ratio | 1.3 | 1.3 | 1.3 |
| Capital | $0 | $0 | $0 |
| Net Surplus | $3,750,799,663 | $3,879,721,103 | $4,181,455,944 |
| Total Life Ins | N/A | N/A | N/A |

## Premiums:

Return to top.

| As of: | Dec. 31, 2012 | Dec. 31, 2013 | Dec. 31, 2014 |
|---|---|---|---|
| Life and Annuities | N/A | N/A | N/A |
| Accident and Health | $0 | $0 | $0 |
| Property and Casualty | $100,164,602 | $124,642,834 | $118,726,043 |
| Total Texas Premium | $100,164,602 | $124,642,834 | $118,726,043 |
| National Premium | $3,003,936,159 | $3,181,705,924 | $3,325,686,627 |

## Complaint Information:

Return to top.

When considering the company's complaint index and ratio, be sure to review the company history information displayed below for recent acquisitions, mergers, or other events that may affect the figures displayed for this company.

| | Dec 31, 2013 | | Dec 31, 2014 | | Jun 12, 2015 |
|---|---|---|---|---|---|
| Confirmed Complaints: | | | | | |
| Life and Annuity | 0 | | 0 | | 0 |
| Accident and Health | 0 | | 0 | | 0 |
| Homeowner | 2 | | 2 | | 0 |
| Automobile | 1 | | 0 | | 0 |
| Workers' Compensation | 0 | | 0 | | 0 |
| Complaint Ratio/Index | Ratio | Index | Ratio | Index | |
| Life and Annuities | N/A | N/A | N/A | N/A | N/A |
| Accident and Health | N/A | N/A | N/A | N/A | N/A |
| Homeowner | .0042 | 1.1452 | .0050 | 1.2494 | N/A |
| Automobile | .0645 | 11.8225 | .0000 | .0000 | N/A |
| Workers' Compensation | .0000 | .0000 | .0000 | .0000 | N/A |

Confirmed Complaints: the number of confirmed complaints closed against the company for the line of insurance and year indicated. A complaint is confirmed if the department receives information indicating that a company committed any violation of an applicable state insurance law or regulation, a federal

requirement the department has authority to enforce or the term or condition of an insurance policy or certificate. A complaint is also confirmed if the complaint and company's response, considered together, suggest that the company was in error or that the complainant had a valid reason for the complaint.

Complaint Ratios: the ratio, expressed as a percentage, is the number of closed confirmed complaints divided by the number of policies the company had in force for the line of insurance and year indicated.

Complaint Index: indicates how a company's ratio of the number of complaints to the number of policyholders compares to the average for all insurers. The index is calculated by dividing the company's percentage of complaints for a specific line of insurance by the company's percentage of the policies in force for the same line of insurance. The average index is 1.00. A number less than 1 indicates fewer complaints than average; a number greater than 1 indicates more complaints than average. For the most recent completed year, a given insurer's index may change over time, as policy count data is received by TDI. This will affect each insurer's percentage of the total.

Complaints against an insurance company are not part of the complaint tally above if the insurance company served only as a Third Party Administrator (TPA), a company hired simply to administer the paperwork of a health plan. Instead, they are included in the complaint record of the insurance company or HMO that hired the TPA. If a bonafide self-insured benefit plan hired the TPA, no complaint numbers are recorded as a part of the company/TPA's profile. Neither are profiles available for self-insured plans, as such plans are regulated under federal law.

# Company History:

Return to top.

| Date | Event |
|---|---|
| 07-15-2011 | APPROVED TO WITHDRAW FROM WRITING TEXAS HOMEOWNER POLICY FORM A (HOA) IN TEXAS. |
| 06-30-2009 | APPROVED ACQUISITION OF 21ST CENTURY INSURANCE COMPANY OF THE SOUTHWEST (95971) AND AIG ADVANTAGE INSURANCE COMPANY (93987) BY COMPANY, FIRE INSURANCE EXCHANGE (29750), TRUCK INSURANCE EXCHANGE (84450) AND FARMERS GROUP, INC., A SUBSIDIARY OF ZURICH FINANCIAL SERVICES LTD. |
| 03-02-2000 | COMPANY, FIRE INSURANCE EXCHANGE AND TRUCK INSURANCE EXCHANGE, LOS ANGELES, CALIFORNIA ACQUIRED FOREMOST COUNTY MUTUAL INSURANCE COMPANY, DALLAS, TEXAS AND FOREMOST LLOYDS OF TEXAS, LEWISVILLE, TEXAS. |
| 11-04-1994 | PENALTY OF $35,000 PAID BY COMPANY, MID-CENTURY INSURANCE COMPANY, FIRE INSURANCE EXCHANGE AND TRUCK INSURANCE EXCHANGE FOR VIOLATIONS FOUND DURING A MARKET CONDUCT EXAMINATION IN ARIZONA. |
| 06-14-1994 | ADDED WORKERS' COMPENSATION & EMPLOYERS' LIABILITY INSURANCE. |
| 09-09-1992 | PENALTY OF $50,000 PAID BY COMPANY AND MID-CENTURY INSURANCE COMPANY FOR VIOLATIONS FOUND DURING A MARKET CONDUCT EXAMINATION IN OHIO. |
| 01-01-1968 | REINSURED ALL PRIVATE PASSENGER AUTOMOBILE POLICIES AND COMPREHENSIVE PERSONAL LIABILITY POLICIES OF TEXAS FARMERS INSURANCE COMPANY (81700) AUSTIN, TEXAS. |
| 03-17-1947 | FORMERLY: FARMERS AUTOMOBILE INTER INSURANCE EXCHANGE (01244). |
| 03-10-1936 | GRANDFATHERED FOR CAPITAL AND SURPLUS REQUIREMENTS |

# Company Officers:

Return to top.

For names of the company's current officers, please contact the company at the phone number listed in the Contact Information above or on their website.

# Texas Department of Insurance

333 Guadalupe St. P.O. Box 149104 Austin, TX 78714-9104

# FIRE INSURANCE EXCHANGE

Skip over these navigation links.

Show Explanation of Terms

Table of Contents

General Info | Contact Info | Types of Insurance | Use of Credit | Attorney for Service | Ratings | Financial Info | Premiums | Complaint Ratios | Company History | Company Officers

## General Information:

Return to top.

| | |
|---|---|
| Type of Entity: | Reciprocal (RE) |
| Status of TX License: | Active |
| Company Status: | Normal Operations |
| License Number: | 29750 |
| NAIC Number: | 21660 |
| TDI Company Number: | 29750 |
| FEIN: | 956235715 |
| Home City/State: | CA |
| Origin: | Foreign |
| Date Incorporated/Organized: | 11/20/1942 |
| Date Licensed/Eligible/Registered in Texas: | 04/11/1950 |
| Date Cancelled/Ineligible/Inactive: | |

## Contact Information:

Return to top.

| | |
|---|---|
| Mailing Address: | P O Box 2478 Terminal Annex Los Angeles CA 90051 |
| Office Number: | (323)932-3200 |
| Toll Free Number: | (800)327-6377 |
| Fax Number: | (323)930-4266 |
| | |
| Physical Address: | 4680 Wilshire Blvd Los Angeles CA 90010 |
| Office Number: | |
| Toll Free Number: | |
| Fax Number: | |

# Types of Insurance Licensed to Write:

Return to top.

- Allied Coverages
- Burglary & Theft
- Fire
- Forgery
- Glass
- Inland Marine
- Liability Other than Auto

# Use of Credit:

Return to top.

To determine if a company uses credit information for private passenger automobile or homeowners insurance.

| Click Here for Use of Credit |

# Attorney for Service:

Return to top.

| Click Here for Attorney for Service Guidelines |

Chris Granger
15700 Long Vista Drive
Austin TX 78728 -3822

# Rating By Financial Organization:

Return to top.

The following organizations rate insurance companies on their financial strength and stability. Some of these companies charge for their services.

A.M. Best
Weiss Ratings Inc.
Standard & Poor's
Moody's Investors Service
Fitch IBCA, Duff and Phelps Ratings

# Financial Information:

Return to top.

| As of: | Dec. 31, 2012 | Dec. 31, 2013 | Dec. 31, 2014 |
|---|---|---|---|
| Total Assets | $2,204,004,831 | $2,254,762,187 | $2,281,746,242 |
| Total Liabilities | $1,541,786,575 | $1,533,507,997 | $1,510,696,042 |
| Asset to Liability Ratio | 1.4 | 1.4 | 1.5 |
| Capital | $0 | $0 | $0 |
| Net Surplus | $662,218,256 | $721,254,189 | $771,050,200 |

| Total Life Ins | N/A | N/A | N/A |
|---|---|---|---|

# Premiums:

Return to top.

| As of: | Dec. 31, 2012 | Dec. 31, 2013 | Dec. 31, 2014 |
|---|---|---|---|
| Life and Annuities | N/A | N/A | N/A |
| Accident and Health | $0 | $0 | $0 |
| Property and Casualty | $43,968,061 | $90,324,748 | $96,021,357 |
| Total Texas Premium | $43,968,061 | $90,324,748 | $96,021,357 |
| National Premium | $1,355,100,056 | $1,443,245,636 | $1,512,462,873 |

# Complaint Information:

Return to top.

When considering the company's complaint index and ratio, be sure to review the company history information displayed below for recent acquisitions, mergers, or other events that may affect the figures displayed for this company.

| | Dec 31, 2013 | | Dec 31, 2014 | | Jun 12, 2015 |
|---|---|---|---|---|---|
| Confirmed Complaints: | | | | | |
| Life and Annuity | 0 | | 0 | | 0 |
| Accident and Health | 0 | | 0 | | 0 |
| Homeowner | 5 | | 4 | | 0 |
| Automobile | 1 | | 0 | | 0 |
| Workers' Compensation | 0 | | 0 | | 0 |
| Complaint Ratio/Index | Ratio | Index | Ratio | Index | |
| Life and Annuities | N/A | N/A | N/A | N/A | N/A |
| Accident and Health | N/A | N/A | N/A | N/A | N/A |
| Homeowner | .0029 | .7907 | .0025 | .6247 | N/A |
| Automobile | .0000 | .0000 | N/A | N/A | N/A |
| Workers' Compensation | N/A | N/A | N/A | N/A | N/A |

Confirmed Complaints: the number of confirmed complaints closed against the company for the line of insurance and year indicated. A complaint is confirmed if the department receives information indicating that a company committed any violation of an applicable state insurance law or regulation, a federal requirement the department has authority to enforce or the term or condition of an insurance policy or certificate. A complaint is also confirmed if the complaint and company's response, considered together, suggest that the company was in error or that the complainant had a valid reason for the complaint.

Complaint Ratios: the ratio, expressed as a percentage, is the number of closed confirmed complaints divided by the number of policies the company had in force for the line of insurance and year indicated.

Complaint Index indicates how a company's ratio of the number of complaints to the number of policyholders compares to the average for all insurers. The index is calculated by dividing the company's percentage of complaints for a specific line of insurance by the company's percentage of the policies in force for the same line of insurance. The average index is 1.00. A number less than 1

indicates fewer complaints than average; a number greater than 1 indicates more complaints than average. For the most recent completed year, a given insurer's index may change over time, as policy count data is received by TDI. This will affect each insurer's percentage of the total.

Complaints against an insurance company are not part of the complaint tally above if the insurance company served only as a Third Party Administrator (TPA), a company hired simply to administer the paperwork of a health plan. Instead, they are included in the complaint record of the insurance company or HMO that hired the TPA. If a bonafide self-insured benefit plan hired the TPA, no complaint numbers are recorded as a part of the company/TPA's profile. Neither are profiles available for self-insured plans, as such plans are regulated under federal law.

# Company History:

Return to top.

| Date | Event |
|------|-------|
| 07-15-2011 | APPROVED TO WITHDRAW FROM WRITING TEXAS HOMEOWNER POLICY FORM A (HOA) IN TEXAS. |
| 06-30-2009 | APPROVED ACQUISITION OF 21ST CENTURY INSURANCE COMPANY OF THE SOUTHWEST (95971) AND AIG ADVANTAGE INSURANCE COMPANY (93987) BY COMPANY, TRUCK INSURANCE EXCHANGE (84450), FARMERS INSURANCE EXCHANGE (27800) AND FARMERS GROUP, INC., A SUBSIDIARY OF ZURICH FINANCIAL SERVICES LTD. |
| 10-23-2000 | PENALTY OF $20,000 FOR VIOLATION OF REQUESTING INSUREDS TO PRODUCE COPIES OF THEIR INCOME TAX RECORDS IN TEXAS. |
| 03-02-2000 | COMPANY, FARMERS INSURANCE EXCHANGE AND TRUCK INSURANCE EXCHANGE, LOS ANGELES, CALIFORNIA ACQUIRED FOREMOST COUNTY MUTUAL INSURANCE COMPANY, DALLAS, TEXAS AND FOREMOST LLOYDS OF TEXAS, LEWISVILLE, TEXAS. |
| 11-04-1994 | PENALTY OF $35,000 PAID BY COMPANY, FARMERS INSURANCE EXCHANGE, MID-CENTURY INSURANCE COMPANY AND TRUCK INSURANCE EXCHANGE FOR VIOLATIONS FOUND DURING A MARKET CONDUCT EXAMINATION IN ARIZONA. |
| 04-11-1950 | GRANDFATHERED FOR CAPITAL AND SURPLUS REQUIREMENTS |

# Company Officers:

Return to top.

For names of the company's current officers, please contact the company at the phone number listed in the Contact Information above or on their website.

## Texas Department of Insurance
333 Guadalupe St. P.O. Box 149104 Austin, TX 78714-9104

# TRUCK INSURANCE EXCHANGE

Skip over these navigation links.

Show Explanation of Terms

Table of Contents
General Info | Contact Info | Types of Insurance | Use of Credit | Attorney for Service | Ratings | Financial Info | Premiums | Complaint Ratios | Company History | Company Officers

## General Information:

Return to top.

| | |
|---|---|
| Type of Entity: | Reciprocal (RE) |
| Status of TX License: | Active |
| Company Status: | Normal Operations |
| License Number: | 84450 |
| NAIC Number: | 21709 |
| TDI Company Number: | 84450 |
| FEIN: | 952575892 |
| Home City/State: | CA |
| Origin: | Foreign |
| Date Incorporated/Organized: | 02/01/1935 |
| Date Licensed/Eligible/Registered in Texas: | 03/10/1936 |
| Date Cancelled/Ineligible/Inactive: | |

## Contact Information:

Return to top.

| | |
|---|---|
| Mailing Address: | P O Box 2478 Terminal Annex<br>Los Angeles CA 90051 |
| Office Number: | (323)932-3200 |
| Toll Free Number: | (800)327-6377 |
| Fax Number: | (323)930-4266 |
| | |
| Physical Address: | 4680 Wilshire Blvd<br>Los Angeles CA 90010 |
| Office Number: | |
| Toll Free Number: | |
| Fax Number: | |

# Types of Insurance Licensed to Write:

Return to top.

- Accident
- Aircraft Liability
- Aircraft Physical Damage
- Allied Coverages
- Auto Physical Damage
- Automobile Liability
- Boiler & Machinery
- Burglary & Theft
- Fidelity & Surety
- Fire
- Glass
- Health
- Inland Marine
- Liability Other than Auto
- Livestock
- Workers Comp and Emp Liability

# Use of Credit:

Return to top.

To determine if a company uses credit information for private passenger automobile or homeowners insurance.

Click Here for Use of Credit

# Attorney for Service:

Return to top.

Click Here for Attorney for Service Guidelines

Chris Granger
15700 Long Vista Drive
Austin TX 78728 -3822

# Rating By Financial Organization:

Return to top.

The following organizations rate insurance companies on their financial strength and stability. Some of these companies charge for their services.

A.M. Best
Weiss Ratings Inc.
Standard & Poor's
Moody's Investors Service
Fitch IBCA, Duff and Phelps Ratings

# Financial Information:

Return to top.

| As of: | Dec. 31, 2012 | Dec. 31, 2013 | Dec. 31, 2014 |
|---|---|---|---|
| Total Assets | $1,963,013,951 | $1,933,396,090 | $2,077,583,374 |
| Total Liabilities | $1,428,051,305 | $1,369,922,187 | $1,458,878,815 |
| Asset to Liability Ratio | 1.3 | 1.4 | 1.4 |
| Capital | $0 | $0 | $0 |
| Net Surplus | $534,962,646 | $563,473,903 | $618,704,559 |
| Total Life Ins | N/A | N/A | N/A |

# Premiums:

Return to top.

| As of: | Dec. 31, 2012 | Dec. 31, 2013 | Dec. 31, 2014 |
|---|---|---|---|
| Life and Annuities | N/A | N/A | N/A |
| Accident and Health | $0 | $0 | $0 |
| Property and Casualty | $81,943,272 | $74,439,212 | $74,247,177 |
| Total Texas Premium | $81,943,272 | $74,439,212 | $74,247,177 |
| National Premium | $767,653,007 | $726,272,215 | $748,336,821 |

# Complaint Information:

Return to top.

When considering the company's complaint index and ratio, be sure to review the company history information displayed below for recent acquisitions, mergers, or other events that may affect the figures displayed for this company.

| | Dec 31, 2013 | | Dec 31, 2014 | | Jun 12, 2015 |
|---|---|---|---|---|---|
| Confirmed Complaints: | | | | | |
| Life and Annuity | 0 | | 0 | | 0 |
| Accident and Health | 0 | | 0 | | 0 |
| Homeowner | 0 | | 0 | | 0 |
| Automobile | 0 | | 0 | | 0 |
| Workers' Compensation | 0 | | 0 | | 0 |
| Complaint Ratio/Index | Ratio | Index | Ratio | Index | |
| Life and Annuities | N/A | N/A | N/A | N/A | N/A |
| Accident and Health | N/A | N/A | N/A | N/A | N/A |
| Homeowner | N/A | N/A | N/A | N/A | N/A |
| Automobile | .0000 | .0000 | .0000 | .0000 | N/A |
| Workers' Compensation | .0000 | .0000 | .0000 | .0000 | N/A |

Confirmed Complaints: the number of confirmed complaints closed against the company for the line of insurance and year indicated. A complaint is confirmed if the department receives information indicating that a company committed any violation of an applicable state insurance law or regulation, a federal requirement the department has authority to enforce or the term or condition of an insurance policy or certificate. A complaint is also confirmed if the complaint and company's response, considered together,

suggest that the company was in error or that the complainant had a valid reason for the complaint.

Complaint Ratios: the ratio, expressed as a percentage, is the number of closed confirmed complaints divided by the number of policies the company had in force for the line of insurance and year indicated.

Complaint Index indicates how a company's ratio of the number of complaints to the number of policyholders compares to the average for all insurers. The index is calculated by dividing the company's percentage of complaints for a specific line of insurance by the company's percentage of the policies in force for the same line of insurance. The average index is 1.00. A number less than 1 indicates fewer complaints than average; a number greater than 1 indicates more complaints than average. For the most recent completed year, a given insurer's index may change over time, as policy count data is received by TDI. This will affect each insurer's percentage of the total.

Complaints against an insurance company are not part of the complaint tally above if the insurance company served only as a Third Party Administrator (TPA), a company hired simply to administer the paperwork of a health plan. Instead, they are included in the complaint record of the insurance company or HMO that hired the TPA. If a bonafide self-insured benefit plan hired the TPA, no complaint numbers are recorded as a part of the company/TPA's profile. Neither are profiles available for self-insured plans, as such plans are regulated under federal law.

# Company History:

Return to top.

| Date | Event |
|---|---|
| 06-30-2009 | APPROVED ACQUISITION OF 21ST CENTURY INSURANCE COMPANY OF THE SOUTHWEST (95971) AND AIG ADVANTAGE INSURANCE COMPANY (93987) BY COMPANY, FIRE INSURANCE EXCHANGE (29750), FARMERS INSURANCE EXCHANGE (27800) AND FARMERS GROUP, INC., A SUBSIDIARY OF ZURICH FINANCIAL SERVICES LTD. |
| 12-12-2003 | APPROVED TO WITHDRAW FROM WRITING MEDICAL MALPRACTICE LIABILITY INSURANCE IN TEXAS. COMPANY MAY NOT RE-ENTER MARKET FOR THIS LINE WITHOUT PRIOR APPROVAL UNTIL 12/12/2008. |
| 03-02-2000 | COMPANY, FARMERS INSURANCE EXCHANGE AND FIRE INSURANCE EXCHANGE, LOS ANGELES, CALIFORNIA ACQUIRED FOREMOST COUNTY MUTUAL INSURANCE COMPANY, DALLAS, TEXAS AND FOREMOST LLOYDS OF TEXAS, LEWISVILLE, TEXAS. |
| 09-19-1995 | APPROVED TO WITHDRAW FROM THE FARM AND RANCH INSURANCE MARKET IN TEXAS. |
| 11-04-1994 | PENALTY OF $35,000 PAID BY COMPANY, FARMERS INSURANCE EXCHANGE, MID-CENTURY INSURANCE COMPANY AND FIRE INSURANCE EXCHANGE FOR VIOLATIONS FOUND DURING A MARKET CONDUCT EXAMINATION IN ARIZONA. |
| 03-10-1936 | GRANDFATHERED FOR CAPITAL AND SURPLUS REQUIREMENTS |

# Company Officers:

Return to top.

For names of the company's current officers, please contact the company at the phone number listed in the Contact Information above or on their website.

Farmers Defendants' Exhibit 18

## NO. GV-202501

| | | |
|---|---|---|
| THE STATE OF TEXAS AND TEXAS COMMISSIONER OF INSURANCE, | § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § § | |
| v. | § § | OF TRAVIS COUNTY |
| FARMERS GROUP, INC., ET AL. | § § § | |
| Defendants. | § § | 261st JUDICIAL DISTRICT |

## DECLARATION OF SAMUEL ISSACHAROFF

| | |
|---|---|
| STATE OF NEW YORK | § § |
| COUNTY OF NEW YORK | § |

1. My name is Samuel Issacharoff, my date of birth is September 15, 1954, and my address is 40 Washington Square South Room 411J, New York, NY, 10012-1005, USA.

2. I am the Bonnie and Richard Reiss Professor of Constitutional Law at New York University School of Law. I began my teaching career in 1989 at the University of Texas, where I held the Joseph D. Jamail Centennial Chair in Law. In 1999, I moved to Columbia Law School, where I was the Harold R. Medina Professor in Procedural Jurisprudence. A true and correct copy of my current curriculum vitae is attached to this declaration.

3. I am a 1983 graduate of Yale Law School and a fellow of the American Academy of Arts and Sciences. I also served as the Reporter for the Principles of the Law of Aggregate Litigation of the American Law Institute. As indicated on my curriculum vitae, I have researched and reviewed numerous class action decisions and other authorities and have published a number of articles, chapters, and books on various topics related to class actions. I also have extensive practical experience with class actions. In particular, I have drafted, consulted on, and participated in the administration of many class action settlements throughout the country in both state and federal courts. I have also served as an expert witness in more than a dozen class actions in general and settlements in particular.

4. I have served as an expert witness on class-related issues for the Farmers defendants in this matter since 2003, and I testified at the May 2003 preliminary approval hearing. I

Farmers
Defendants'
Exhibit
18
No. D-1-GV-02-002501

1

am unable to be at the July 1, 2015, hearing on preliminary approval in this matter, as I have a preexisting commitment out of the country during that time. If I were able to present live testimony at the hearing, I would offer the following opinions for the Court's consideration in connection with the decision on preliminary approval of the Second Amended Settlement Agreement, as supplemented ("Settlement Agreement").

5. I have reviewed the Fourth Amended Plea in Intervention of Intervenor Charles O. Grigson, as well as the testimony of Mr. Grigson's expert witness, Charles Silver from the December 4, 2014, hearing in this matter. I understand Mr. Grigson to be challenging the Settlement Agreement because of the issue of how the costs of the settlement are to be borne. As I understand the opposition, Mr. Grigson's view is that it is unfair and improper for defendant Farmers Group, Inc., not to be funding the entire settlement.

6. Any class settlement is ultimately a question of the proper resolution of the case with regard to the claims of the plaintiff class. For example, in Section 3.05 of the ALI Principles of Aggregate Litigation there are four criteria that instruct a supervising court in the approval of a classwide settlement. The four are: (1) the adequacy of the representation of the class; (2) the fairness and reasonableness of the relief obtained in light of the risks and costs of further litigation; (3) the equitable treatment of class members relative to each other; and (4) the absence of collusion in the negotiations. The defendants' respective contributions to the funding of the Settlement Agreement are not mentioned in this account, nor has this been an issue in reported class action decisions with which I am familiar. Instead, the issue is whether the consideration to the class members is fair, adequate, and reasonable in exchange for the release of their existing claims against the defendants.

7. In all my experience with class action settlements, I have not seen a court's settlement approval turn on the inter-defendant distribution of losses. Nor have I seen an objecting class member successfully challenge a class action settlement based on the allocation of settlement funding as between the payors of the settlement. The issue for class members is the exchange they receive for the release of their claims. To the extent there were a dispute over allocation of responsibility among various defendants or their insurers, for example, that would most likely be the subject of a different proceeding at a different time.

8. Allocation among different potential cost-bearers does come up in class action settlements. In class action settlements of securities and shareholder derivative litigation, for example, the settling defendants frequently include the corporation (in which the plaintiff is a shareholder/owner) and officers and directors of the corporation. The allocation itself is not part of the settlement analysis, except insofar as it might indicate that the settlement did not obtain a sufficient amount for the plaintiff class.

2

9. In all of my experience, I have never seen an objecting class member successfully challenge approval of a class action securities or derivative settlement based on these allocation decisions.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED in New York County, State of New York, on the 28th day of May, 2015.

Samuel Issacharoff

3